*Decision will be entered under Rule 50.*

HARRY C. USHER, SR., AND MYRTIS C. USHER, PETITIONERS, *v.* COM-MISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2475–63.  Filed November 30, 1965.

*Harvey R. Kitay* and *William Fox Geenty*, for the petitioners.
*Albert R. Doyle*, for the respondent.

#### OPINION

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year 1960 in the amount of $179,519.58.

The parties having reached agreement with respect to one of the issues, the only issue remaining for decision is whether the transfer in 1960 by the petitioner, Myrtis C. Usher, of stock in Sarong, Inc., to a trust pursuant to an agreement wherein the trust agreed to pay her an annuity for her life, constituted the purchase of a private annuity, with the result that her recognizable income in 1960 upon the transaction is limited to the payments received in such year, as she contends, or whether the sale of such stock to Ten Kenton Corp., which in form was made by the trust, was in substance a sale by her in 1960, pursuant to a preexisting agreement to sell, with the result that she is taxable in 1960 on the full amount of gain upon the sale, as determined by the respondent.

All of the facts have been stipulated and are incorporated herein by this reference.

The petitioners are husband and wife residing in Woodbridge, Conn.  They filed a joint Federal income tax return for the year

1960 with the district director of internal revenue at Hartford, Conn., upon the cash method of accounting. Petitioner Harry C. Usher, Sr., was, prior to the year 1960 when he retired, an executive officer of Sarong, Inc., a manufacturer of ladies' undergarments. Petitioner Myrtis C. Usher was during all times relevant to this case a housewife.

The petitioners were stockholders in Sarong, Inc. (hereinafter referred to as Sarong), and the Dora Miles Co. (hereinafter referred to as Miles). The outstanding capital stock of Sarong at January 28, 1960, consisted of 7,499 shares of common stock without par value. At that time the outstanding stock of Miles consisted of 11,208 shares of common stock without par value and 252 shares of preferred stock. As of January 28, 1960, the petitioners held stock in Sarong and Miles as follows:

| | Sarong | Miles | |
| --- | --- | --- | --- |
| | Common stock (shares) | Common (shares) | Preferred (shares) |
| Myrtis C. Usher | 1, 68 | None | 62 |
| Harry C. Usher, Sr | 182 | 197 | 6 |

On January 28, 1960, after prior negotiations, all the stockholders of Sarong and Miles signed a "Memorandum of Understanding" with Ten Kenton Corp., hereinafter referred to as Ten Kenton, a wholly owned subsidiary of International Latex Corp., whereby they agreed to sell and Ten Kenton agreed to buy all of the stock of Sarong and Miles for a total price of $3 million. Such agreement was signed by International Latex Corp. as guarantor of performance by Ten Kenton. Ten Kenton did not negotiate separately for the stock of Sarong and Miles. The agreement provided in part as follows:

I. For and in consideration of the purchase price of $3,000,000 to be paid by Kenton to the undersigned stockholders of Sarong and Miles ("Stockholders"),

(a) On the closing date, as hereinafter defined, the Stockholders will sell to Kenton all of the outstanding common and preferred stock of Sarong and Miles, * * *

*        *        *        *        *        *        *

(f) Unless otherwise directed by an instrument or instruments in writing signed by all of the Stockholders and/or their respective assignees under Article XII hereof, on the closing date Kenton will pay $2,700,000 by delivery of a certified check payable to the order of "Cleary, Gottlieb, Steen & Hamilton, Esqs., as attorneys for certain stockholders of Sarong, Inc. and The Dora Miles Company under an agreement between Ten Kenton Coroporation and such stockholders dated January 28, 1960", or if such direction is so given, in accordance therewith; the balance of the purchase price will be paid by delivery of a certified check in the amount of $300,000 payable to the order of the New York City bank selected by Kenton as escrow agent under Article VII hereof.

II. The closing will be at the offices of Corporation Trust Company, 100 West Tenth Street, Wilmington, Delaware, on the first business day following the 10th day after the execution of the contract referred to in Article IV hereof, or if such contract is not executed within 10 days after the date hereof, on such later date as either party shall fix by notice to the other party but in no event sooner than 20 days after the date hereof. Notwithstanding the foregoing, at any time after the date hereof Kenton may by written notice set a date for the closing not sooner than 10 days nor more than 30 days after the date of the notice and the closing shall take place on such date at the place specified in the preceding sentence even though the formal contract referred to in Article IV hereof has not been executed. The date on which the closing actually takes place is herein referred to as the "closing date."

III. Stockholders jointly and severally represent, warrant and covenant to Kenton that:

   \*       \*       \*       \*       \*       \*       \*

(d) Stockholders

On the closing date the Stockholders (and/or their respective assignees under the provisions of Article XII hereof) will be the sole and absolute owners and holders, free and clear of any liens, encumbrances or restrictions of any and every character, of all the issued and outstanding shares of common stock and preferred stock of Sarong and Miles. Each Stockholder has the full power, right and legal capacity to enter into this agreement and to keep, observe and perform the terms, conditions and provisions hereof. The Stockholders (and/or their respective assignees under the provisions of Article XII hereof) will have, on the closing date, the full power, right and legal capacity to transfer all the issued and outstanding shares of common and preferred stock of Sarong and Miles and will deliver certificates representing such shares duly endorsed for transfer in blank, or with duly executed assignments in blank, with signatures guaranteed, evidence of the payment of all taxes required-under any law upon the transfer of such stock and other customary related documents.

   \*       \*       \*       \*       \*       \*       \*

(f) Financial Information

There is annexed hereto as Exhibit 1 a copy of the balance sheet of Sarong as at November 30, 1959. There is annexed hereto as Exhibit 2 a copy of the balance sheet of Miles as at November 28, 1959. Such balance sheets have been prepared in accordance with generally accepted accounting principles applied on a basis consistent with that of the preceding fiscal years, and are correct and complete and accurately set forth the financial position of Sarong and Miles as at November 30, 1959 and November 28, 1959, respectively, \* \* \*

   \*       \*       \*       \*       \*       \*       \*

(h) No Decrease in Net Worth to Closing Date

From December 1, 1959 to the closing date there will not be any decrease in the net worth of $2,001,357.97 of Sarong as shown on the balance sheet attached as Exhibit 1 except losses resulting from transactions in the ordinary course of business. From November 29, 1959 to the closing date there will not be any decrease in the net worth of $45,542.84 of Miles as shown on the balance sheet attached as Exhibit 2 except losses resulting from transactions in the ordinary course of business.

   \*       \*       \*       \*       \*       \*       \*

IV. As soon as practical after the execution of this Memorandum of Understanding, the parties will reduce the terms hereof to a formal written agreement

and duly execute such agreement which will include the above terms, and will include such other representations and warranties by the Stockholders (which will survive the closing) as are usual in a transaction of this character, * * *

V. Failure of the parties to reduce this agreement to such a formal document shall not affect the validity and enforceability of the other provisions of this memorandum of understanding. If the parties fail to reduce this agreement to such a formal document, the representations, warranties and covenants referred to in Article IV shall be deemed representations, warranties and covenants made on the date hereof.

VI. Kenton and its accountants, agents and attorneys will be permitted to make such investigations of the assets, books and records of Miles and Sarong prior to the closing date as Kenton shall deem necessary.

VII. Of the purchase price, ten percent shall be deposited by Kenton in escrow on the closing date with a New York City bank to be selected by Kenton as security for the payment of possible liabilities of the Stockholders to Kenton by reason of representations, warranties or covenants made by Stockholders in this agreement. Five months after the closing date the escrow agent shall pay to Stockholders and/or their respective assignees under Article XII the balance then held in escrow less the amount of all liabilities asserted by Kenton against Stockholders (or their respective assignees under Article XII) in the proportions in which the $2,700,000 payment under Article I(f) was made to the Stockholders and/or their assignees. The amounts retained by the escrow agent at the end of such five month period shall be paid over to Stockholders and/or their respective assignees under Article XII in the proportions in which the $2,700,000 payment under Article I(f) was made to the Stockholders and/or their assignees or Kenton, as the case may be, when each claim asserted by Kenton is determined in favor of the Stockholders or Kenton. The fees and expenses of the escrow agent shall be borne by Kenton. Nothing in this Article VII shall limit the duration or extent of the liability of Stockholders under their representations, warranties and covenants.

VIII. All warranties and representations made herein shall be true as of the closing date as though made at such time and shall survive the closing date. The obligations of the Stockholders and their respective assignees under the representations, warranties and covenants made by the Stockholders herein shall not be affected or limited by any investigation heretofore made or made up to and including the closing date by Kenton or by reason of any assistance rendered by Kenton in preparing the balance sheets attached hereto as Exhibits 1 and 2.

     *        *        *        *        *        *        *

XII. Any of the Stockholders' rights hereunder may be assigned to a purchaser of the stock of such Stockholders upon the assumption by the purchaser of such Stockholders' obligations hereunder. If any Stockholder assigns any of his rights hereunder, such Stockholder shall automatically, and without the execution of any further documents, be deemed the guarantor of all the obligations of his assignee under this memorandum of understanding.

XIII. All notices hereunder shall be in writing and shall be deemed to have been duly given when mailed, registered mail, postage and registration fees prepaid, as follows:

     *        *        *        *        *        *        *

If to any one or more of the common or preferred stockholders of Sarong and/or Miles, one notice to

SARONG STOCKHOLDERS,
c/o CLEARY, GOTTLIEB, STEEN & HAMILTON,
*52 Wall Street,*
*New York 5, New York*

The stockholders of Sarong and Miles agreed among themselves that they would place a value of $164.583 per share on the preferred stock and $0.363 per share on the common stock of Miles for a total of $45,542.83, with the balance of the sales price, or $2,963,457.16, being allocated to the common stock of Sarong. Such values represented the fair market values of such stocks on January 28, 1960.

On February 9, 1960, the petitioner, Harry C. Usher, Sr., established an irrevocable trust, naming the Bank of N. T. Butterfield & Son, Ltd., of Hamilton, Bermuda,[1] as trustee, and naming as beneficiaries Harry C. Usher, Jr., and John C. Usher, the two sons of the petitioners. The settlor transferred to the trust $5,000 in cash. By the terms of the trust indenture the trust was to remain in existence for a period of 11 years or until the death of petitioner Myrtis C. Usher, whichever might be later. The trustee was authorized to invest the trust funds in securities without regard to securities that are legal for trustee investment.

It was provided that the trustee should pay to the beneficiaries such income of the trust as it might, in its absolute discretion, from time to time deem advisable, and that upon termination of the trust the trustee should pay the capital to such beneficiaries or their issue. It was specifically provided that in no event should the settlor or his estate be a beneficiary.

The trust indenture established a "Trust Management Advisory Committee" to consist of not less than three and not more than five, and which should consist in the first instance of Harry C. Usher, Jr., David Henry Graham, and Alexander J. Frith. It was provided that the committee members, or a surviving single member, had the right to appoint further members up to the maximum and to fill any vacancies caused by resignations. It was further provided that in the event all members should resign or be unable to act, then the power of appointing initial new members should vest in the settlor. It was provided that the committee should act in a fiduciary capacity, and that a majority decision of the members of the committee should be binding. The committee was granted, among other powers, the following powers: To direct the trustee to carry into effect any directions of the committee with regard to the management and investment of the trust fund (which included, among other things, the purchase and sale of

---

[1] In 1960 the trust department of the bank had under administration assets of a value in excess of £21 million.

any property and the entering into of any contract or undertaking with any person) ; to approve or reject any proposals of the trustee in connection with the management of the fund; to remove the trustee at any time; and to appoint successor trustees.

The trust indenture further provided that the settlor or any other person might from time to time assign, transfer, and convey to the trustee additional property, either real or personal; that all such additional property so transferred should be held in such allocation as between shares as the person making the addition should determine; and that if no determination should be made the allocation should be as provided in the trust instrument.

Among the powers granted to the trustee, subject to the giving of notice in writing to the trust management advisory committee, was the power to raise and pay out of the trust fund any estate or other duty, if any, which might be payable on the death of the settlor or on the death of any person who has assigned or transferred property to the trustee by way of settlement and which may be or may at any time have been subject to the trust.

The trust indenture provided that the rights of all parties and the construction and effect of the trust provisions should be construed under the law of the Islands of Bermuda, except that the trustee might at any time, by written instrument, declare that thereafter such rights and constructions should be in accord with the law of any other place in any part of the world.

On the same date that the trust was established, and as part of a prearranged plan, petitioner Myrtis C. Usher transferred her 1,968 shares of common stock of Sarong to the trust, and entered into an agreement with the Bank of N. T. Butterfield & Son, Ltd., as trustee, which provided in part as follows:

2. THE BANK OF N. T. BUTTERFIELD AND SON LTD. hereby acknowledges receipt of the said shares in the common stock of Sarong, Inc.

3. It is mutually agreed by the parties hereto that the value of each such share in the common stock of Sarong, Inc., was immediately before the aforementioned transfer, three hundred and ninety four dollars ($394) in the currency of the United States of America.

4. In consideration of the aforementioned transfer by MYRTIS C. USHER of the said one thousand nine hundred sixty eight shares in the common stock of Sarong, Inc., THE BANK OF N. T. BUTTERFIELD AND SON LTD., in its fiduciary capacity as Trustee under the said Indenture of Trust, hereby covenants and agrees to pay semi-annually to MYRTIS C. USHER, or her order the sum of thirty four thousand five hundred and ninety-four dollars ($34,594) in the currency of the United States of America for so long as she may live.

5. It is mutually agreed by the parties hereto that the first payment under the last foregoing Article shall be made on the 26th day of February, 1960, and that subsequent payments shall be made semi-annually thereafter, in each case at such place and in such manner as MYRTIS C. USHER may from time to time designate and appoint.

6. It is mutually agreed and declared by the parties hereto that payments under Article 3 [sic, Article 4] of this Agreement shall cease and determine without apportionment or proration upon the death of MYRTIS C. USHER.

\*      \*      \*      \*      \*      \*      \*

8. It is mutually agreed and understood by the parties hereto that THE BANK OF N. T. BUTTERFIELD AND SON, LTD. contracts under this Agreement only in it fiduciary and representative capacity as Trustees under the said Indenture of Trust, and that THE BANK OF N. T. BUTTERFIELD AND SON, LTD. shall not otherwise be liable in its undertakings or obligations under this Agreement, and that such undertakings and obligations shall be a charge only in the assets of the Trust established under the said Indenture of Trust, and that no part whatsover of the general assets of THE BANK OF N. T. BUTTERFIELD AND SON, LTD. shall be charged with any of the undertakings or obligations under this Agreement.

\*      \*      \*      \*      \*      \*      \*

10. It is mutually agreed and declared by the parties hereto that the terms and provisions of this Agreement shall be subject to, and shall be construed exclusively in accordance with, the law of Bermuda for the time being.

The payments provided in the above agreement were computed on the actuarial basis, using a value of $394 per share for the Sarong stock transferred to the trust.[2]

On February 8, 1960, the day preceding the above-described agreement, and agreement had been executed by the petitioners and their two sons, the Bank of N. T. Butterfield & Son, Ltd., as trustee, Ten Kenton and International Latex Corp., which recited that the petitioner Myrtis C. Usher intended to sell and transfer 1,968 shares of Sarong to the trustee. Therein it was agreed that in such event she would remain bound by all warranties set forth in the memorandum of understanding of January 28, 1960, as if she "had not sold and transferred her * * * stock of Sarong, Inc. to Trustee"; that on the closing date the trustee would sell and deliver the stock to Ten Kenton for the consideration stated and in accordance with the terms and conditions of the memorandum of understanding; that notwithstanding anything to the contrary contained in article XII of the memorandum of understanding the trustee would not incur any liability either as primary obligor or guarantor nor be bound in any manner under such memorandum except as just stated; that the petitioner Harry C. Usher and his two sons guaranteed prompt performance by the trustee of its obligations which it would assume with respect to the stock; and that International Latex Corp. confirmed its guarantee of performance by Ten Kenton of its obligations under the memorandum of understanding.

The memorandum of understanding of January 28, 1960, was the only agreement between Ten Kenton and the stockholders of Sarong

---

[2] It has been stipulated that for the purposes of this case the computation and the value placed on the stock were fair and accurate.

and Miles and was not reduced to or replaced by any other formal written agreement subsequent to its execution.[3]

On February 18, 1960, the attorneys representing the shareholders of Sarong and Miles proposed February 24, 1960, as the closing date under the memorandum of understanding, and such date was agreed to by Ten Kenton.

At an undisclosed time before the closing date the 1,968 shares of Sarong stock, with Federal stock transfer taxes of $157.44 attached thereto, were transferred on the books of the corporation from Myrtis C. Usher to the Bank of N. T. Butterfield & Son, Ltd., as trustee. By letter addressed to Ten Kenton, dated February 24, 1960, the Bank of N. T. Butterfield & Son, Ltd., as assignee of petitioner Myrtis C. Usher under the memorandum of understanding "and as owner of 1,968 shares of the common stock of Sarong," agreed to accept $775,352.97 as the purchase price for such stock and agreed that $77,535.29 thereof should be placed in escrow. At the closing the Bank of N. T. Butterfield & Son, Ltd., was represented as being one of the selling stockholders, acting through O. R. Orton, its trust officer.

On February 28, 1960, all of the shares of stock of Sarong and Miles were transferred to Ten Kenton pursuant to the memorandum of understanding of January 28, 1960. Upon completion of the sales, Ten Kenton, pursuant to the sales agreement, paid the various shareholders of Sarong and Miles a total of $2,700,000, of which $697,817.68 was paid to the Bank of N. T. Butterfield & Son, Ltd. It also placed $300,000 in escrow, of which $77,535.29 was allocable to the bank. Of the $300,000 held in escrow, $225,000 was paid over to the shareholders by December 31, 1960, leaving only $75,000 still unpaid as of that date.

The Bank of N. T. Butterfield & Son, Ltd., in June 1960, invested the funds received by it from Ten Kenton in Canadian bonds to the extent of approximately $235,000, in oil royalties from oil wells in Louisiana to the extent of $58,000, and in stocks of various corporations.

During the year 1960 the petitioner Myrtis C. Usher received from the Bank of N. T. Butterfield & Son, Ltd., as trustee, pursuant to the above agreement of February 9, 1960, two semiannual payments, each in the amount of $34,594, or a total of $69,188.

Petitioner Myrtis C. Usher was advised by her attorneys, prior to entering into the transactions described above, that under existing law (both the Internal Revenue Code and case law), she could, in her attorneys' opinion, avoid the Federal estate tax, if any, on the proceeds

---

[3] On Feb. 24, 1960, Ten Kenton and the stockholders (including the petitioner Myrtis C. Usher, but not the Bank of N. T. Butterfield & Son, Ltd.) executed an agreement which made a slight change in the wording of art. III(h) of the memorandum of understanding dealing with representations as to net worth of the corporations which was mutually agreed upon, but which ratified and confirmed such memorandum in all other respects.

of the sale of her Sarong stock by entering into the described transactions, in particular the annuity agreement. In addition, and as a second purpose of the plan, she was advised by her attorneys that no capital gains tax would be payable in 1960 on the entire proceeds of the sale of the Sarong stock and that the transaction, in the opinion of her attorneys, would be reportable for income tax purposes as an annuity under section 72 of the Internal Revenue Code, although a capital gains tax would be payable each year as the annuity payments were received.

In their income tax return for the taxable year 1960 the petitioners reported the amount of $69,188 as annuity payments, treating $13,-837.60 thereof as ordinary annuity income and $52,370.14 as long-term capital gain. The petitioners computed the amount of ordinary annuity income as follows:

| | |
|---|---:|
| Investment in contract | [1] $775,392.00 |
| Expected return | $968,632.00 |
| Percentage of income to be excluded | 80 |
| Amount received this year | $69,188.00 |
| Amount excludable | $55,350.40 |
| Taxable portion | $13,837.60 |

[1] The amount paid by Ten Kenton to the Bank of N. T. Butterfield & Son, Ltd., as trustee, was $697,817.68 and the amount placed in escrow which was allocable to such bank was $77,535.29, or a total of $775,352.97. There is no explanation of the variance of $39.03.

The portion reported as long-term capital gain was computed as follows:

| | |
|---|---:|
| Excludable portion of annuity payments | $55,350.40 |
| Cost of Sarong stock | 2,980.26 |
| Net long-term capital gain | 52,370.14 |

In the notice of deficiency the respondent determined that the petitioner Myrtis C. Usher in 1960 realized a long-term capital gain in the amount of $736,946.39 on the disposition of her stock in Sarong, of which 50 percent, or $368,473.20, was to be taken into account. However, the respondent took into account the fact that the petitioner had reported $26,185.07 (one-half of the gain of $52,370.14) and therefore added to reported taxable income the amount of $342,288.13.

It is the contention of the petitioner Myrtis C. Usher that she is not taxable upon the sale of the Sarong stock; that such stock was sold by the trust after it had been transferred to the trust in exchange for a "private" annuity to be paid her by the trust; that the promise of the trust, which was not in the business of granting annuities, to pay the annuity has no ascertainable fair market value for the purpose of computing capital gain; and that therefore she is not taxable upon any greater amount of capital gain, or ordinary income, than was reported in the joint return, citing *J. Darcie Lloyd*, 33 B.T.A. 903.

The respondent contends that when the petitioner signed the memorandum of understanding on January 28, 1960, she had completed all the steps necessary to sell her Sarong stock to Ten Kenton; that when she transferred title to the stock to the trust there was nothing for the trust to do but pass along title to the stock in conformity with the memorandum of understanding; that in substance the sale was completed by the petitioner, the trust being a mere conduit; and that therefore she is taxable upon the full amount of capital gain on the sale in the taxable year 1960. The respondent concedes that the petitioner properly reported the amount of annuity income under section 72 of the Code, apparently on the theory that the cost of the annuity was the amount of the proceeds of the sale. It is his position that therefore the question of whether the annuity received by the petitioner was a noncommercial annuity (and hence not susceptible of evaluation) is a moot point in this case.

There can be no question that in form the trust sold the Sarong stock to Ten Kenton after it had been transferred to it by the petitioner, and that it received the proceeds of such sale. And there can be no question that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or to altogether avoid them, by means which the law permits. *Gregory* v. *Helvering*, 293 U.S. 465. However, the incidence of taxation depends upon the substance of a transaction. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331. There an oral agreement had been reached by a corporation and a vendee as to the terms and conditions of sale of real property, but when the parties met to reduce the agreement to writing the corporation declined to consummate the sale. Thereupon the property was transferred by the corporation to its two shareholders in the form of a liquidating dividend and they then entered into a contract with the vendee embodying substantially the same terms and conditions previously agreed upon, and formally transferred the property to the vendee. The Supreme Court, in holding that the corporation sold the property and was taxable upon the gain upon the sale, stated in part:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

See also *John E. Palmer*, 44 T.C. 92.

Under the circumstances here presented, it is our conclusion that the sale of the Sarong stock to Ten Kenton must be attributed to the petitioner Myrtis C. Usher and that she is taxable in 1960 upon the full amount of the gain realized upon such sale. Under the memorandum of understanding of January 28, 1960, the petitioners, along with the other stockholders of Sarong, had bound themselves to sell their stock to Ten Kenton for a specified selling price, and Ten Kenton had bound itself to purchase such stock at such price, subject only to its confirmation of the representations made by the stockholders that the financial condition of Sarong was accurately set forth in its balance sheet of November 30, 1959, and to confirmation that from December 1, 1959, to the closing date there had been no decrease in Sarong's net worth except for losses which might result from transactions in the ordinary course of business.

The petitioners contend that since the memorandum of understanding recited that as soon as practicable the terms thereof would be reduced to a formal written agreement, such memorandum of understanding should not be considered as a definitive agreement between the parties. We cannot agree with this view. Elsewhere in such memorandum it was provided that failure of the parties to execute a further formal document should not affect the validity and enforceability of such memorandum. The petitioner also makes much of the fact that the memorandum of understanding of January 28, 1960, did not set a definite closing date for the sale. However, there can be no question that there were adequate provisions for the fixing of a closing date. It was provided that if (as was the actual case) no further formal agreement was executed, then either party had the right to set the closing date within certain specified time limits. Actually it was the stockholders of Sarong, including the petitioner Myrtis C. Usher, who, through their representative, set the closing date. There can be no question, we think, that it was the intention of all parties to the memorandum of understanding that the Sarong stock would be sold in accordance with the terms of such memorandum.

The memorandum of understanding recognized that any stockholder had the right to assign his rights under the memorandum provided the purchaser of the stock assumed the obligations of the stockholder, but that in such event the stockholder should automatically be deemed the guarantor of the obligations of the assignee. On February 8, 1960, the petitioners, Ten Kenton, and the trustee entered into an agreement in which it was specified that on the closing date the trustee would sell and deliver the 1,968 shares of Sarong stock to Ten Kenton for the consideration stated. It was provided that the trustee would not incur any liability either as primary obligor or guarantor, nor be bound in any manner under the memorandum of

understanding of January 28, but therein the petitioner Harry C. Usher, Sr., who caused the trust to be formed, and the two sons, who were the beneficiaries of the trust, guaranteed performance by the trust. On February 9, 1960, the same day that the trust was created, and as part of a prearranged plan, the petitioner Myrtis C. Usher transferred her stock to the trust.

Obviously, the trust was not free to dispose of the stock to any other person but was bound to deliver it to Ten Kenton and receive the previously agreed purchase price. Thus, we think the trust must be considered as a mere conduit to carry out the sale for the petitioner Myrtis C. Usher and apply the proceeds according to her direction, namely, to hold such proceeds (or the investments acquired with such proceeds) for the purpose of paying her an amount of $34,594 semi-annually for the duration of her life, the first payment to be made on February 26, 1960. The calculation on the annuity payments to be made was based upon the then value of the stock (which was the amount to be received from such sale) and upon the life expectancy of the petitioner Myrtis C. Usher. Thus, if the petitioner should live out her life expectancy she would receive the entire amount of the proceeds of sale. It may be added in passing that if she should live beyond her life expectancy it is problematical whether she would receive further payments, since it was specifically provided in the agreement with the trustee that this undertaking should be a charge only on the assets of the trust, and the only other asset of the trust was the $5,000 contributed by the petitioner Harry C. Usher, Sr. If she should die short of her life expectancy it is true that she will not have personally received the full selling price of the stock. However, in such event, under the terms of the trust and the agreement between her and the trustee, any amount which would otherwise be received by her would inure to the benefit of the natural objects of her bounty, her two sons. In our opinion the petitioner Myrtis C. Usher in entering into the binding contract of sale and causing the trust to carry out such contract and use the proceeds in the manner described enjoyed the benefit of such proceeds, including the portion thereof representing capital gain, as completely as she would have had she in form collected the proceeds of the sale and transferred them to the trust to be used as above described. See *Helvering* v. *Horst*, 311 U.S. 112, and *Helvering* v. *Eubank*, 311 U.S. 122.

We have carefully examined the cases cited by the petitioner, but consider them distinguishable from the instant case. None of them involved a binding contract to sell such as that in the instant case. For example, in *Preston R. Bassett*, 33 B.T.A. 182, affirmed per curiam (C.A. 2) 90 F. 2d 1004, the taxpayer had not, prior to the transfer of certain stock in trust, reached an agreement for the sale of the stock

to a third party, and in *Grand Rapids Trust Co. et al., Administrators*, 34 B.T.A. 170, the taxpayer had contracted to sell certain stock for a fixed price on a fixed date, but only if the other contracting party *elected* to purchase, and such election had not been made prior to the taxpayer's transfer of stock to his corporation. Cf. *John E. Palmer*, *supra*.

In view of the foregoing, the respondent's determination with respect to this issue is approved.

*Decision will be entered under Rule 50.*