Pannill **MARTIN** and Mary Martin,
Plaintiffs,

v.

Irving **MACHIZ**, District Director of Internal Revenue for the District of Maryland, Defendant.

Civ. No. 15740.

United States District Court
D. Maryland.

March 9, 1966.

William A. Grimes, Frank B. Ober, Ober, Williams & Grimes, Baltimore, Md., for plaintiffs.

Moshe Schuldinger, Atty., Dept. of Justice, Richard M. Roberts, Acting Asst. Atty. Gen., David A. Wilson, Jr., Atty., Dept. of Justice, Washington, D. C., Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, First Asst. U. S. Atty., Baltimore, Md., for defendant.

WINTER, District Judge:

Mr. and Mrs. Pannill Martin (taxpayers) sue to recover income taxes and interest assessed, in the total amount of $298,959.68, for the calendar years 1959 and 1960. During those years taxpayers, individually and not jointly, were the majority stockholders of The Cloverdale Spring Company (Cloverdale), a soft drink bottling company. The assessments were made by charging to taxpayers' income a proportionate share of the payment of $3,000.00 by Cloverdale, in 1959, for a financial analysis of the company,[1] and by treating as a long term capital gain to taxpayers in 1960 the gain realized from the sale of a part of Cloverdale's stock, formerly owned by taxpayers, but which had been conveyed by them prior to the formal execution of a contract of sale, or consummation of the questioned sale, to a charitable trust in which they retained life interests as to income only, with a remainder to charitable uses. Two questions are presented for decision: (1) was a portion of the $3,000.00 payment by Cloverdale in 1959 for the financial analysis income to the taxpayers, and (2) was the long term capital gain realized in 1960 a capital gain realized by taxpayers or by the trust?

In broad outline, the evidence shows that in 1959 taxpayers owned 96% of the common stock, and approximately 39% of the preferred stock, of Cloverdale. Taxpayer-husband was the presi-

---

1. Although the government's pleadings and the stipulation between the parties appear to include the entire $3,000.00 payment in the taxpayers' income, the government's trial brief explains that in fact the District Director determined the whole study fee was income to the stockholders generally as being for their benefit but only a proportional amount based upon the percentage of common stock they owned in Cloverdale was al-located to taxpayers. Since the deficiency notice was not introduced into evidence, the Court will accept the government's explanation as fact. The discrepancy may have arisen because at the time taxpayers owned 96% of the common stock of Cloverdale, and it makes very little difference in amounts of additional tax and interest whether $2,880.00 or $3,000.00 of additional income is allocated to taxpayers.

dent, treasurer and a director of Cloverdale.

In 1958 taxpayer-husband entered into an agreement with a Baltimore brokerage firm with the intent that the latter find a purchaser for Cloverdale. At that time taxpayer-husband was seventy-one years old and was contemplating ultimate retirement. This agreement was terminated when no substantial interest in an acquisition of Cloverdale had been generated. On May 6, 1959, a new agreement was made with The Industrial Corporation of Baltimore (Industrial), a corporation under the active management of one of the directors of Cloverdale, under the terms of which Industrial was to determine the value of Cloverdale " * * * as a basis for merger or valuation for other purposes * * * " and to "locate merger and/or sale and/or refinancing to market personal ownership of Mr. Martin." Industrial was to be paid a study fee of $3,000.00 and a commission of 2% of the "gross valuation received" in any sale, merger or refinancing, against which the flat fee would be charged as a credit.

The valuation study was completed and negotiations with various prospective purchasers begun. During the course of earlier negotiations, when the agreement with the brokerage firm was in effect, a certain Morton Lapides (Lapides) had become interested in purchasing Cloverdale, but no agreement for that purpose had been reached. Lapides renewed his interest in January, 1960 by advice to Industrial that he was prepared to meet what he understood to be taxpayer-husband's asking price. Sales negotiations and preparation of proposed documents for a sale of stock ensued.

Taxpayer-husband, who for many years had expressed an intent to make a gift to establish scholarships for needy boys at McDonogh School, concluded, contemporaneously with the course of the latter negotiations with Lapides, to carry out his intent, and directed his counsel to prepare a deed of trust. The directions to the attorney were made definite in March, 1960, and preparation of the instrument, including consultation with associate tax counsel in New York, ensued. On April 7, 1960, taxpayers executed a deed of trust naming taxpayer-husband and his counsel as trustees, and conveyed to the trustees 1,000 of the 1,440 shares of common stock of Cloverdale held by taxpayers. On the same date, certificates representing the shares were endorsed and delivered to a bank for transfer. The charitable uses to which the corpus was dedicated were to establish scholarships for boys at McDonogh School, McDonogh, Maryland, and/or college scholarship loans for McDonogh School graduates.

Two days later, taxpayers individually, taxpayer-husband as trustee, and the other trustee under the deed of trust, executed a contract for the sale of all of the stock of Cloverdale to Pepsi-Cola Commonwealth Bottlers, Inc. (Pepsi-Cola), a company formed by Lapides to purchase the Cloverdale stock. Under the terms of the contract an aggregate of 1,440 shares of common stock, 102 shares of preferred stock, and 257 shares of prior preferred stock were sold. In the interim between employment of Industrial and the contract to Pepsi-Cola taxpayer-husband had acquired additional shares of prior preferred. The agreement with Pepsi-Cola also provided that Pepsi-Cola would offer to purchase all of the outstanding shares of common, preferred and prior preferred stock held by any stockholder other than the taxpayers at prices stated therein. Pepsi-Cola did not execute the contract and make payment of the $100,000.00 which the agreement required upon its execution and delivery until April 19, 1960, ten days after taxpayers had executed the agreement, and twelve days after taxpayers had executed the deed of trust.

Taxpayers filed gift tax returns and paid tax on the transfer of their stock to the trustees under the deed of trust and, for 1960, they filed a joint income tax return in which they claimed as a charitable contribution the amount of $55,785.28 for their transfer of 1,000 shares of Cloverdale's common stock to

the trust. They reported no gain from the sale of the 1,000 shares to Pepsi-Cola, but they did report as long term capital gains the gain realized from the sale of 440 shares of common stock which they sold in their individual capacity. For 1960 the trust reported long term capital gain of $500,225.97, but it paid no tax thereon because the principal of the trust was irrevocably devoted to charitable purposes.

Additional and specific facts will be stated in regard to the question presented to which they relate.

*The Financial Analysis Fee—*

In question only is the $3,000.00 paid by Cloverdale to Industrial in 1959. Defendant's brief asserts that the District Director determined that payment of this fee "was solely a benefit of taxpayers," but the District Director allocated to taxpayers' income for 1959 only that percentage of $3,000.00 which equaled the percentage of all common stock in Cloverdale which they owned. The amount so allocated was $2,880.00 and a deficiency assessment of $1,545.60, together with interest of $381.10, was paid on June 5, 1964.

The stated purpose of Industrial's employment has heretofore been detailed. The memorandum of agreement was signed by taxpayer-husband individually and not in the name of Cloverdale. The memorandum was a form supplied and filled out by Industrial, and it was in an individual capacity that taxpayer-husband was apparently requested to sign.

In his testimony, taxpayer-husband said that it was "he" who hired Industrial, and he admitted that the purpose of obtaining the appraisal was to enable him to dispose of his investment in Cloverdale so as to provide a secure investment for the charitable purposes that he had in mind.

The evidence thus recited points to the employment of Industrial as a personal undertaking by taxpayers, or at least by taxpayer-husband. On the other hand, the evidence shows that prior to Industrial's employment taxpayer-husband had evidenced a desire to retire. There were other stockholders, holding both common and preferred stock, as well as key employees, whose interests merited protection, but, more importantly the future of Cloverdale after taxpayer-husband was no longer "living and running it" was problematic.

Citing Loewy Drug Co. of Baltimore City v. United States, 232 F.Supp. 143 (D.Md.1964); Wall v. United States, 164 F.2d 462 (4 Cir. 1947); and Sachs v. Commissioner of Internal Revenue, 277 F.2d 879 (8 Cir. 1960), cert. denied 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59 (1960), defendant argues that the Industrial fee was not an "ordinary and necessary expense" of Cloverdale, 26 U.S. C.A. § 162, but was a personal expense of taxpayers, taxable to them as income in 1959, the year of payment on their behalf. The implication of this argument is that what is not an ordinary and necessary business expense of the corporation must be a personal expense of its stockholders. The question to be decided is not susceptible of a simple "either-or" answer. The fact that an expense was not an ordinary and necessary business expense of a corporation does not unerringly point to the conclusion that the expense was a personal expense of the corporation's stockholders. An expense might be a capital expense to a corporation, or a non-allowable expense of a corporation, and still not be a personal expense of the corporation's stockholders. E. g., Note, The Deductibility of Attorneys' Fees, 74 Harv.L.Rev. 1409, 1409–13 (1961).

The action of the District Director in his treatment of this item weakens his submission that payment "was solely a benefit of taxpayers." The District Director would charge the expense to the taxpayers as a constructive dividend but, at the same time, the District Director would charge to the taxpayers as a constructive dividend only that portion of the expense which reflects the ratio of their stockholdings to the total issued and outstanding stock of Cloverdale. In

this type of situation where the issue is whether the expense was incurred to benefit certain stockholders, or the corporation rather than whether it was to benefit all stockholders or to serve a business purpose of the corporation, the District Director impliedly admits the very fact to be decided, namely, that the expense was for the benefit of Cloverdale, and through it a benefit to all stockholders, and not solely for the personal benefit of the taxpayers. The fact that taxpayers were the majority stockholders of Cloverdale, and that any benefit to Cloverdale would benefit them more than persons owning lesser stock interests is immaterial. The corporate entity may not be so lightly disregarded, if there was in fact a corporate purpose to be served by preparation of the financial analysis.

▮▮▮▮ The authorities cited by the defendant, at most, demonstrate that the facts in the case at bar distinguish it from the usual case in which the doctrine of constructive dividend is employed to effect an increased tax liability on the part of a shareholder. Here, the preponderance of the evidence convinces the Court that the ultimate benefits hoped to be derived from the financial analysis, and in fact derived therefrom, were for the benefit of the corporation and, through it, for its stockholders as a whole. The testimony of the taxpayer-husband, the managing head and a principal stockholder in his own right, that "he" employed Industrial, and that the purpose of the study was for "his" purposes, is viewed by the Court as but an inartful expression of the fact that he was the managing head of Cloverdale, and that Cloverdale's future depended upon some arrangement for a satisfactory succession to his leadership in the event of his retirement, illness or death. Thus, the Court concludes that the payment was not payment of a personal expense of taxpayers or taxpayer-husband, but was a payment for the benefit of Cloverdale and serving its legitimate corporate business purpose, whether or not it was an item chargeable against the corporation's ordinary income as an ordinary and necessary business expense. It follows that recovery of the assessment and interest attributable to such payment should be allowed.

*Capital Gain on Sale of 1,000 Shares—*

In regard to this item, the District Director added to taxpayers' adjusted gross income for 1960 the sum of $501,-135.92. The effect of this addition enabled taxpayers to claim a greater deduction for a charitable contribution (20% of their adjusted gross income), with the net result that the District Director computed a deficiency in tax for 1960 in the amount of $250,327.96, with interest of $46,705.02, and these amounts were paid on June 5, 1964. The significance of the specific facts which bear upon the correctness of the District Director's determination of a deficiency is more apparent if there is first considered the law which controls the decision of the question presented.

It is not disputed that if the sale of 1,000 shares of the common stock of Cloverdale was made by taxpayers, or was to be considered as having been made by taxpayers, the deficiency assessment is correct. It is not disputed, also, that if the sale was made by the Trustees the realization of long term capital gains is tax exempt, because under the trust agreement taxpayers reserved a life estate only as to income, with remainder to charitable purposes. Indeed, the trust instrument provided: "All capital gains and all capital payments received by the Trustees shall be added to and become part of the trust fund." In form the sale of the 1,000 shares was made by the trust and the long term capital gain realized by the trust. The sole ground of attack on the tax exempt status of the capital gain is predicated on the assertion that the evidence shows that the sale by the Trustees was, notwithstanding its form, in substance, a sale by taxpayers.[2] Stated otherwise, defendant

---

**2.** In his post-trial brief, filed after the presentation of evidence was concluded, ▮▮▮▮▮▮ but before final argument, defendant advanced a second theory in support of his

asserts that the trust was a mere conduit through which taxpayers consummated an agreement of sale arrived at before the trust as a legal entity came into being.

In support of this contention, defendant relies upon Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). This authority must be considered and compared with United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950). In *Court*, a closely held corporation whose sole asset was an apartment building, entered into negotiations for the sale of the apartment. An oral agreement was reached as to the terms and conditions of the sale, and the parties had met to reduce the agreement to writing when counsel for the seller advised that the sale would result in a large income tax on the corporation. The transaction was purportedly canceled, although a deposit on the transaction was not returned; the corporation was liquidated and its assets distributed to its stockholders; and the stockholders entered into a new contract with the buyers, embodying substantially the same terms and conditions previously agreed upon. The deposit which had been made to the corporation was applied in part payment of the purchase price to be paid the corporation's stockholders.

Concluding that the liquidation of the corporation and the subsequent sale of its assets by its stockholders were mere formalities designed to make the transaction appear to be other than what it was to avoid tax liability the Tax Court held that the corporation was liable for the gain which accrued from the sale. The Circuit Court of Appeals reversed, but the conclusion of the Tax Court was reinstated by the Supreme Court. The latter said:

"On the basis of these findings, the Tax Court was justified in attributing the gain from the sale to respondent corporation. The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. [fn. 4, citing authorities] To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." 324 U.S. at 334, 65 S.Ct. at 708.

In the *Cumberland* case, the stockholders of a public service corporation concluding that the corporation could no longer compete with other companies that had been successful in obtaining low cost electric energy from TVA, offered to sell all of its stock to a cooperative which was receiving such power. The cooperative refused to buy the stock, but countered with an offer to buy the public service corporation's transmission and distribution equipment. The corporation rejected this offer because it would have been compelled to pay a substantial capital gains tax, but its stockholders offered to acquire the transmission and distribution equipment and then to sell it to the cooperative. This proposal was accepted; the public service corporation trans-

position. Succinctly stated, the theory was that taxpayer-husband's co-trustee, his attorney, was not an adverse party, 26 U.S.C.A. § 672(a), so that taxpayer-husband should be treated, under either 26 U.S.C.A. § 675 or 26 U.S.C.A. § 677, as the owner of the trust res and taxable on capital gains realized from

sales of the res. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); Regulations on Income Tax (1954 Code), § 1.675–1, 26 C.F.R. § 1.-675–1. At the time of final argument, defendant stated that he was abandoning this theory and withdrawing the portion of his brief relating thereto.

ferred its transmission and distribution systems to its shareholders in partial liquidation; and the shareholders then executed the previously contemplated sale to the cooperative. Under the theory of the *Court* case, the government claimed that the public service corporation was liable for the tax on the capital gains which the sale generated. The contention was rejected by the Supreme Court.

 The Supreme Court characterized its opinion in the *Court* case as one where it held that the incidence of taxation depends upon the substance of a transaction, regardless of mere formalisms, and that taxes on a corporate sale cannot be avoided by using the shareholders as a conduit through which to pass title. Following this introduction, the Court said, 338 U.S. at 454–456, 70 S.Ct. at 282–283:

> "This language does not mean that a corporation can be taxed even when the sale has been made by its stockholders following a genuine liquidation and dissolution. [fn. 3, citing authorities] While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. * * * a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation.

> "Here, on the basis of adequate subsidiary findings, the Court of Claims has found that the sale in question was made by the stockholders rather than the corporation. The Government's argument that the shareholders acted as a mere 'conduit' for a sale by respondent corporation must fall before this finding. The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion.

Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes.

\* \* \* \* \* \*

"Congress having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate. It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. * * * * "

 That substance and not form is controlling is a broad principle of tax law, recognized in fact situations similar and dissimilar to the case at bar. Simon v. Commissioner of Internal Revenue, 285 F.2d 422 (3 Cir. 1960); James Realty Co. v. United States, 280 F.2d 394 (8 Cir. 1960); Weller v. Commissioner of Internal Revenue, 270 F.2d 294 (3 Cir. 1959); Kanawha Gas & Utilities Co. v. Commissioner of Internal Revenue, 214 F.2d 685 (5 Cir. 1954). Equally well-recognized is the principle that a taxpayer has a right to mold business transactions in a manner which has the effect of minimizing the incidence of taxation. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); United States v. Isham, 17 Wall. 496, 84 U.S. 496, 21 L.Ed. 728 (1873).

To determine whether substance differs from form in the case at bar, the Court turns to the facts relating to the 1960 transaction. The evidence shows that two skeins of circumstances must be considered. They were independent in their genesis, but they became intertwined in April, 1960.

As an alumnus of McDonogh School, taxpayer-husband had a fondness for the institution, gratitude for what it had done for him, and an intent to benefit it by devoting a substantial portion of his

material gain to assist it in carrying out its worthy objectives. This intent was formed well before any thought of disposition of Cloverdale was considered. Taxpayer-husband would have acted on his intent well before negotiations for disposition of Cloverdale was contemplated, but counsel for taxpayer-husband discouraged action because he felt that substantial problems could be created if taxpayer-husband divested himself of control of Cloverdale, and vested control in a foundation or irrevocable trust. Notwithstanding the advice of counsel, taxpayer-husband made inquiries in 1957 and 1958 to find out how other benefactors had devoted their wealth to charitable uses, even to the point of obtaining a copy of the articles of association of a charitable foundation created by an acquaintance. In September, 1958, taxpayer-husband forwarded to his counsel the articles of incorporation and by-laws of another charitable fund for counsel's consideration. Discussions between taxpayer-husband and his counsel continued from time to time about the creation of a charitable trust or foundation, but counsel was not clear about taxpayer-husband's specific intention or of counsel's own recommendation, so that the discussions did not result in concrete action.

The decision to market Cloverdale was not arrived at until 1958, and the employment of Industrial was not formalized until March 6, 1959. The second set of negotiations with Lapides, which ultimately resulted in the completed transaction, began January 23, 1960, when Lapides advised Industrial that he was prepared to offer $1,600,000.00 in cash for the assets of Cloverdale. Thereafter, taxpayer-husband discovered that if a sale of assets occurred there would be payable both a federal tax on capital gains and a 5% state income tax on liquidating dividends.[3] Taxpayer-husband then insisted that he would be interested only in a sale of stock. While the parties were thus in general agreement that the consideration for the transaction would be $1,600,000.00 cash, as was typical with a transaction of this magnitude, there were many problems to be overcome, and many terms and conditions to be agreed upon. Particularly was this so because Lapides, as described by Mr. G. Harvey Porter, President of Industrial, was " * * * a charming person and a delightful promoter without means." No one thought that he had the money to consummate the transaction, and everyone was afraid that he could not raise the money for that purpose.

In late January, 1960, counsel for Lapides and counsel for taxpayer-husband began the preparation of a contract of sale, defining the various problems to be surmounted and agreeing upon a resolution thereof. Taxpayer-husband and his counsel during the subsequent negotiations fully reserved all of their rights, in that they did not commit themselves to sell to Lapides for $1,600,000.00, and counsel affirmatively stated that his agreement to any term or provision of the proposed contract of sale was not binding upon his client until his client evidenced his formal assent thereto by execution of the document and Lapides made the down payment provided for in the agreement. That taxpayer-husband and counsel meant just that was shown by the fact that they continued to answer inquiries from other would-be purchasers and were prepared to negotiate with other would-be purchasers at the same time that they were negotiating with Lapides. In fact, after advising Lapides in March, 1960, that they would not negotiate with him until the deed of trust was executed, they responded to an inquiry from another would-be purchaser.

In March, 1960, counsel for taxpayer-husband met with the latter in Florida to go over a draft of a proposed contract of sale prepared by Lapides' counsel. It was at this time that taxpayer-husband instructed counsel to prepare a deed of trust and counsel obtained a definitive expression from taxpayer-husband of the

---

3. Anno.Code of Md., Art. 81, § 279(g) (Supp.1965); Rafferty v. Comptroller of Treasury, 228 Md. 153, 178 A.2d 896 (1962).

magnitude and purpose of the proposed charitable gift. Preparation of the deed of trust went forward and involved consultation with tax counsel in New York. It was after this date that various drafts of documents reflected a sale of a portion of Cloverdale's stock by the Trustees; theretofore, taxpayers were treated as the sole sellers.

The various negotiations between counsel for Lapides and counsel for taxpayer-husband about the sale need not be detailed. It suffices to say that at the time taxpayer-husband instructed his counsel to prepare the trust instrument, counsel for both parties were far from agreement on the terms and conditions of a contract of sale. While the negotiations were going on, taxpayer-husband was concerned about the federal and Maryland income tax consequences of the proposed transaction. He had received advice about these matters shortly after his employment of Industrial from its attorney, and he received additional advice during the course of the negotiations.

At the time that the deed of trust was executed—April 7, 1960—there were two areas in which counsel for the parties were not in agreement. These areas were (a) the insistence by Lapides that, in addition to a continuing warranty that Cloverdale had no liabilities not disclosed in its financial statement, and an agreement by the sellers to indemnify the buyer for any breach of warranty on the part of Cloverdale, the sellers would be required to execute a surety bond with a corporate surety in an amount not exceeding $200,-000.00, as security for the performance of their indemnity agreement, and (b) the insistence of Lapides that settlement be held September 1, 1960. Taxpayer-husband was adamant that (a) he would not post a bond to secure compliance of his obligations under the agreement and (b) Lapides must settle no later than August 1, 1960. Indeed, this impasse had been reached at the time that taxpayer-husband instructed his counsel to prepare the deed of trust. Immediately thereafter, counsel for taxpayer-husband had advised counsel for Lapides, orally and in writing,

that no further negotiations would be undertaken until after the deed of trust was executed.

The matters not agreed upon at the time that the deed of trust was executed were substantial. The general feeling that Lapides did not have, nor could he raise, the money to consummate the transaction dictated to the mind of taxpayer-husband the earliest settlement date which could be obtained so that if Lapides demonstrated inability to perform, Cloverdale would not be off the market for an undue length of time. This suspicion was not ill-founded, because Lapides, who was a candid witness at the trial, freely admitted that he was not successful in raising the final $12,500.00 to make the deposit required by the agreement until April 19, 1960, the date on which he executed the contract. The Court infers that taxpayer-husband, as a successful owner and managing head of Cloverdale over a period of many years, deeply resented being called upon to post a bond, with corporate surety to secure performance of his word, and he refused to pay the premium on such a bond. Conversely, through the eyes of Lapides, he wanted, and in fact required, as much time to raise capital to consummate the transaction as he could get and, knowing taxpayer-husband's obvious age, he wanted security for taxpayer-husband's promise to perform, so that Lapides might not be caught with exacting performance from an estate diminished by *inter vivos* gifts. Although there was a scintilla of evidence to the contrary, the Court finds that at the time the deed of trust was executed and Cloverdale's stock delivered to the bank none of the parties thought that there was a contract between them. In this regard, it is not without significance that the deed of trust empowered the Trustees to retain any securities received by them without liability for loss resulting from such retention and without regard to principles of diversification or suitability of such property as a trust investment.

On the day that the deed of trust was executed, there was present Mr. Gilbert

D. Redmond, the vice-president, general manager and business confidant of taxpayer-husband, who was himself an orphan boy who graduated from McDonogh, thus giving him a close bond of relationship with taxpayer-husband. Mr. Redmond had been aware of some of the negotiations which had transpired insofar as they related to the valuation of Cloverdale. He did not know of the other terms and conditions, but, in the course of a luncheon following execution of the papers, he learned of them. Mr. Redmond, understandably had some concern about his future position with Cloverdale, and he sought and obtained permission from taxpayer-husband and his counsel to communicate with Lapides to see if he could bring about a meeting of the minds on the two problems which taxpayer-husband and his counsel thought insurmountable at that time. Permission was granted, and Redmond communicated with Lapides. Redmond was a successful honest broker. By the next morning, he persuaded Lapides not to require a bond with corporate surety, but to accept in lieu thereof an agreement to indemnify, limited in amount to a maximum of $100,000.-00 and continuing for three years. Redmond also persuaded Lapides to agree to settle August 1, 1960, with the right to extend settlement to September 15, 1960, by giving notice of his election and depositing an additional $100,000.00. Taxpayer-husband was persuaded by Redmond to agree to these proposals. Based upon the results of these negotiations, the agreement of sale was redrafted to reflect the changes, and was executed by taxpayers and taxpayer-husband since taxpayers were returning to Florida. Lapides did not sign until April 19, 1960, because it was not until that time that he raised sufficient funds to make the initial downpayment.

■ To establish that there was a mutual understanding or meeting of the minds between the parties prior to April 7, 1960, the date of execution of the deed of trust, defendant places great reliance on the testimony of counsel for Lapides, and also on the fact that Redmond was able to bring about an express agreement within such a short period. The direct testimony of counsel for Lapides gives support to this contention, although such testimony is in part in conflict with that of his client. The cross examination of counsel for Lapides is a classic example of the efficacy of that device in arriving at the truth, since the witness was forced to recant the major portion of his assertions unfavorable to the taxpayers' position. How or why Redmond achieved a resolution of the problems preventing execution of a contract of sale in such a short period is not explained. Perhaps the parties were weary of past disagreements and anxious to consummate the deal, or perhaps a fresh, new face acting as an intermediary between the principals could accomplish more than two attorneys, each zealous in protecting the entrenched position of his respective client. While there is some evidence to support defendant's position, the preponderance of the evidence establishes that the concept of a charitable trust originated before and independently of the sale, the deed of trust was executed before and independently of the sale, and at the time the deed of trust was executed no mutual understanding or meeting of the minds or contract existed between the parties. In short, the Court finds as an ultimate fact that the substance of the transaction was precisely in accordance with its form.

■ A case like the case at bar, which turns upon a determination of fact, rarely has its counterpart in previously decided cases. The case at bar is unexceptional in this regard. However, two recent decisions should be noticed: Magnolia Development Corp. v. Commissioner, 29 P–H Tax Ct.Mem. 1032 (1960); and Usher v. Commissioner, 45 T.C. 205 (Nov. 30, 1965). Magnolia is distinguishable from the case at bar because the pledge of stock to a bank prior to the transfer of the stock, subject to the pledge, to Stetson University, was a pledge to secure an artificially created loan, i. e., the loan had no business purpose, and the taxpayer had no intention of repaying it. Similarly, the Usher case is distinguishable

because the terms and conditions under which the stock, subsequently transferred to a trust, was to be sold, were arrived at prior to the transfer and, in fact, reduced to a formal memorandum of agreement. In the case at bar, the Court has found that the trust was created for a reason apart from the sale; the ultimate disposition of Cloverdale's stock was not arrived at, or agreed upon, until after the transfer to the trust had been made; and ultimate disposition of the 1,000 shares of Cloverdale's common stock was agreed to by the Trustees and not taxpayers. The Trustees realized the capital gain, and not taxpayers.

Counsel may prepare an order entering judgment for taxpayers, in accordance with the views expressed herein.