Susie Salvatore v. Commissioner.
Salvatore v. Commissioner
Docket No. 5150-67.
United States Tax Court
T.C. Memo 1970-30; 1970 Tax Ct. Memo LEXIS 331; 29 T.C.M. (CCH) 89; T.C.M. (RIA) 70030; February 4, 1970. Filed Richard S. Pastore, for the petitioner. Larry Kars and Jay S. Hamelburg, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in petitioner's income tax for 1963 in the amount of $31,016.60. The only issue presented for decision is whether petitioner is taxable on all or only one-half of the gain realized on the sale of certain real property in 1963. Findings of Fact Petitioner was a legal resident of Greenwich, Connecticut, at the time her petition was filed. She filed an individual Federal 90 income tax return for 1963 with the district director of internal revenue, Hartford Connecticut. Petitioner's husband operated an oil and gas service station in Greenwich, Connecticut, for a number of years prior to his death on October 7, 1948. His *332 will, dated December 6, 1941, contained the following pertinent provisions: SECOND: I give devise and bequeath all of my estate both real and personal of whatsoever the same may consist and wheresoever the same may be situated of which I may die possessed or be entitled to at the time of my decease, to my beloved wife, SUSIE SALVATORE, to be hers absolutely and forever. I make no provision herein for my beloved children because I am confident that their needs and support will be provided for by my beloved wife. * * * FOURTH: I hereby give my Executors full power to sell any and all of my property in their discretion and to execute any and all necessary deed or deeds of conveyance of my said property or any part or parts thereof, and which said deed or deeds, conveyance or assignment so executed by my Executors shall be as good and effectual to pass the title to the property therein described and conveyed as if the same had been executed by me in my lifetime. For several years after her husband's death petitioner's three sons, Amedeo, Eugene, and Michael, continued operating the service station with the help of her daughter Irene, who kept the books of the business. Sometime *333 prior to 1958, however, Michael left the service station to undertake other business endeavors; and in 1958 Eugene left to enter the real estate business, leaving Amedeo alone to manage and operate the service station. During this period and until 1963, petitioner received $100 per week from the income of the service station. This sum was not based on the fair rental of the property, but was geared to petitioner's needs for her support. The remaining income was divided among the family members who worked in the business. The land on which the service station was located became increasingly valuable. Several major oil companies from time to time made purchase proposals, which were considered by members of the family. Finally, in the early summer of 1963 representatives of Texaco, Inc. (hereinafter Texaco), approached Amedeo regarding the purchase of the service station property. Petitioner called a family conference and asked for advice on whether the property should be sold. Realizing that Amedeo alone could not operate the station at peak efficiency, petitioner and her children decided to sell the property if a reasonable offer could be obtained. Amedeo continued his negotiations *334 with Texaco and ultimately received an offer of $295,000. During the course of the negotiations Eugene discovered that tax liens in the amount of $8,000 were outstanding against the property. In addition, there was an outstanding mortgage, securing a note held by Texaco, on which approximately $50,000 remained unpaid. The family met again to consider Texaco's offer. As a result of the family meeting (including consultation with petitioner's daughter Geraldine, who lived in Florida), it was decided that the proposal should be accepted and that the proceeds should be used, first, to satisfy the tax liens and any other outstanding liabilities. Second, petitioner was to receive $100,000, the estimated amount needed to generate income for her life of about $5,000 per year - the approximate equivalent of the $100 per week she previously received out of the service station income. Third, the balance was to be divided equally among the five children. To effectuate this family understanding, it was agreed that petitioner would first convey a one-half interest in the property to the children and that deeds would then be executed by petitioner and the children conveying the property to Texaco. *335 On July 24, 1963, petitioner formally accepted Texaco's offer by executing an agreement to sell the property to Texaco for $295,000, the latter making a down payment of $29,500. Subsequently, on August 28, 1963, petitioner executed a warranty deed conveying an undivided one-half interest in the property to her five children. This deed was received for record on September 6, 1963. By warranty deeds dated August 28 and 30, 1963, and received for record on September 6, 1963, petitioner and her five children conveyed their interest in the property to Texaco; Texaco thereupon tendered $215,582.12, the remainder of the purchase price less the amount due on the outstanding mortgage. Petitioner filed a Federal gift tax return for 1963, reporting gifts made to each of her 91 five children on August 1, 1963, of a 1/10 interest in the property and disclosing a gift tax due in the amount of $10,744.35. After discharge of the mortgage and the tax liens the remaining proceeds of the sale (including the down payment) amounted to $237,082, of which one-half, $118,541, was paid to petitioner. From the other half of the proceeds the gift tax of $10,744.35 was paid and the balance was distributed *336 to the children. In her income tax return for 1963 petitioner reported as her share of the gain from the sale of the service station property a long-term capital gain of $115,063 plus an ordinary gain of $665. Each of the children reported in his 1963 return a proportionate share of the balance of the gain. In the notice of deficiency respondent determined that petitioner's gain on the sale of the service station property was $238,856, all of which was taxable as long-term capital gain. Thereafter each of petitioner's children filed protective claims for refund of the taxes which they had paid on their gains from the sale of the service station property. Opinion The only question is whether petitioner is taxable on all or only one-half of the gain realized from the sale of the service station property. This issue must be resolved in accordance with the following principle stated by the Supreme Court in Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945): The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from *337 gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. 4 To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Footnote omitted. Emphasis added.] See $2 Harry C. Usher, Sr., 45 T.C. 205 (1965); $2 John E. Palmer, 44 T.C. 92 (1965), affirmed per curiam 354 F. 2d 974 (C.A. 1, 1965). The evidence is unmistakably clear that petitioner owned the service station property prior to July 24, 1963, when she contracted to sell it to Texaco. Her children doubtless expected ultimately to receive the property or its proceeds, either through gifts or inheritance, and petitioner may have felt morally obligated to pass it on to them. But at that time the children *338 "held" no property interest therein. [1] Petitioner's subsequent conveyance, unsupported by consideration, of an undivided one-half interest in the property to her children - all of whom were fully aware of her prior agreement to sell the property - was merely an intermediate step in the transfer of legal title from petitioner to Texaco; petitioner's children were only "conduit[s] through which to pass title." That petitioner's conveyance to the children may have been a bona fide completed gift prior to the transfer of title to Texaco, as she contends, is immaterial in determining the income tax consequences of the sale, for the form of a transaction cannot be permitted to prevail over its substance. In substance, petitioner made an anticipatory assignment to her children of one-half of the income from the sale of the property. The artificiality of treating the transaction *339 as a sale in part by the children is confirmed by the testimony by petitioner's witnesses that the sum retained by her from the sale was a computed amount - an amount sufficient to assure that she would receive income in the amount of approximately $5,000 annually. If the sales price had been less, petitioner would have retained a larger percentage of the proceeds; if more, we infer, she would have received a smaller percentage. [2] While the children's desire to provide 92 for their mother's care and petitioner's willingness to share the proceeds of her property with her children during her lifetime may be laudable, her tax liabilities cannot be altered by a rearrangement of the legal title after she had already contracted to sell the property to Texaco. *340 All the gain from sale of the service station property was taxable to petitioner. We find nothing in Oscar Deinert, 11 B.T.A. 651 (1928), or Charles W. Walworth 6 B.T.A. 788 (1927), cited by petitioner, which requires an opposite conclusion. Decision will be entered for the respondent. Footnotes
1. Sec. 1221, I.R.C. 1954↩, defines the term "capital asset" to mean "property held by the taxpayer."
2. Eugene Salvatore testified as follows: Q. You stated that you wanted one hundred thousand dollars for your mother. That is, this was to be her share, more or less? A. Yes. Q. If the property was sold for one hundred thousand dollars would your mother have kept all the money? A. She had to. Q. She would have? A. She would have kept all the money. Q. Because she needed the money to live on the interest? A. Because we felt she needed it to live on. Q. The children would have got nothing? A. If she got $90 a week the five children would have made up the difference. We felt she needed the money to live on.↩