ESTATE OF HENRY A. ROSENBERG, DECEASED, RUTH B. ROSENBERG, ADMINISTRATRIX C.T.A. AND RUTH B. ROSENBERG, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75781–75783.    Filed July 27, 1961.

*Carolyn E. Agger, Esq., John S. McDaniel, Jr., Esq., John W. Cable III, Esq., Julius M. Greisman, Esq.,* and *Louis Eisenstein, Esq.,* for the petitioners.

*George J. Rabil, Esq.,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax for 1952 as follows:

| Petitioners | Docket No. | Deficiency |
|---|---|---|
| Estate of Henry A. Rosenberg and Ruth B. Rosenberg | 75781 | $386,481.88 |
| Estate of Fanny B. Thalheimer and Alvin Thalheimer | 75782 | 387,208.92 |
| Jacob Blaustein and Hilda K. Blaustein | 75783 | 371,305.93 |

The sole issue presented is whether under the circumstances here present, the proceeds realized from the sale of preferred stock in 1952 resulted in capital gain or ordinary income.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by reference.

Henry A. Rosenberg and Ruth B. Rosenberg, Alvin Thalheimer and Fanny B. Thalheimer, and Jacob Blaustein and Hilda K. Blaustein were, respectively, husband and wife in the year 1952 and each couple

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Fanny B. Thalheimer, Deceased, Alvin Thalheimer, Herbert Thalheimer, Jacob Blaustein, and Ruth B. Rosenberg, Executors, and Alvin Thalheimer, Docket No. 75782; Jacob Blaustein and Hilda K. Blaustein, Docket No. 75783.

filed a joint income tax return for that year with the director of internal revenue at Baltimore, Maryland. Henry A. Rosenberg died on February 23, 1955, and Ruth B. Rosenberg was appointed administratrix c.t.a. of his estate on March 29, 1955. Fanny B. Thalheimer died on May 28, 1957. Alvin Thalheimer, Herbert Thalheimer, Jacob Blaustein, and Ruth B. Rosenberg were appointed executors of her estate on June 21, 1957. Ruth B. Rosenberg, Fanny B. Thalheimer, and Jacob Blaustein were sisters and brother and are sometimes hereinafter referred to as petitioners.

American Trading and Production Corporation, hereinafter designated as Atapco, is a corporation organized in 1931 under the laws of the State of Maryland. In 1951 and 1952 Atapco was engaged in the oil industry. Its interests included the marine transportation of petroleum products and the acquisition, exploration, and development of crude oil and gas properties. Also, Atapco and the Blaustein family together owned between 25 and 30 percent of the stock of Pan American Petroleum and Transport Company, the majority of which was owned by Standard Oil of Indiana. In addition, Atapco had stockholdings in the Crown Central Petroleum Corporation.

On December 26, 1951, the authorized stock of Atapco consisted of 30,000 shares of no-par common stock of which 22,000 were outstanding. These shares were held as follows:

| Stockholders | Shares |
|---|---|
| Jacob Blaustein, trustee | 5,500 |
| Henrietta Blaustein | 1,600 |
| Jacob Blaustein | 3,597 |
| Fanny B. Thalheimer | 3,917 |
| Ruth B. Rosenberg | 3,917 |
| In treasury | 3,469 |
| | 22,000 |

The 5,500 shares held by Jacob Blaustein, as trustee, were in trust for the benefit of his wife and their three children. Henrietta Blaustein is the mother of petitioners.

In 1951 Karl F. Steinmann, counsel for Atapco and the Blaustein family, contacted a broker in Baltimore with reference to doing some financing for Atapco. The broker referred him to the First Boston Corporation. In the late spring of 1951, Steinmann and John W. Cable who also represented Atapco and the Blausteins met with Charles Glavin, a vice president of First Boston, to discuss the financial arrangements of Atapco and its stockholders. Steinmann at that time was contemplating making a recommendation that a public market be created in the common stock of Atapco. Glavin pointed out the problems involved with making an offering of that type, such as the registration with the Securities and Exchange Commission which

would include a complete disclosure, the cost and expense, as well as the substantial sacrifice in values that generally accompanies an initial offering by a company unknown to the public. The idea of creating a public market was subsequently abandoned.

Steinmann, thereafter, disclosed to Glavin that petitioners were considering replacing the outstanding common stock of Atapco with several classes of stock. Glavin was asked to advise them on the terms of a first preferred stock which would be salable by the holders thereof. The objective was to create a good-quality preferred stock which would be accepted by institutional investors. Atapco did not need additional outside capital in 1951 as it had sufficient earnings and capital on hand.

With respect to the contemplated preferred stock, Glavin recommended an adequate sinking fund or mandatory retirement provision, limitations on the amount of preferred stock and funded indebtedness of the corporation, limitations on the dividends of junior stocks, restrictions on the sale of the Pan American and Crown Central shares held by Atapco, and certain other terms which are normally contained in a good-quality preferred stock. Jacob Blaustein objected to the proposed limitations relating to the funded indebtedness and the disposition of the Pan American and Crown Central shares. He was of the opinion that these two limitations were not important as Atapco had no intention of selling either the Pan American or Crown Central shares and there was no need for such a debt limitation. Although Glavin thought the proposed preferred stock would be salable, he felt that the inclusion of the two limitations would make the issue more attractive.

On December 26, 1951, the directors and stockholders of Atapco approved amendments to its charter providing for an authorized capital of 300,000 shares of class A first preferred stock with a $10 par value, 300,000 shares of class B first preferred stock with a $10 par value, 1 million shares of second preferred stock with a $10 par value, and 200,000 shares of common stock without par value. The amendments also provided for the exchange of 16 shares of class B first preferred stock, 32 shares of second preferred stock, and 10 shares of the new common stock for each share of common stock outstanding. On December 27, 1951, the articles of amendment were filed with and approved by the State Tax Commission.

The directors of Atapco approved the new stock certificates and authorized the issuance of the new shares pursuant to the articles of amendment on December 27, 1951, and the new shares were duly issued to the stockholders.

On December 27, 1951, immediately after the change in capital structure, the stockholders of Atapco and their respective holdings were as follows:

| Stockholders | Class B first preferred | Second preferred | Common |
|---|---|---|---|
| Jacob Blaustein, trustee | 88,000 | 176,000 | 55,000 |
| Henrietta Blaustein | 25,600 | 51,200 | 16,000 |
| Jacob Blaustein | 57,552 | 115,104 | 35,970 |
| Fanny B. Thalheimer | 62,672 | 125,344 | 39,170 |
| Ruth B. Rosenberg | 62,672 | 125,344 | 39,170 |
| | 296,496 | 592,992 | 185,310 |

The holders of class B first preferred shares were entitled to cumulative dividends at the rate of 5 percent, payable quarterly. The shares were redeemable in whole or in part, at the option of the corporation, for a sum equal to all unpaid dividends accumulated to date plus $10.30 per share if redeemed on or before January 1, 1955; $10.20 per share if redeemed on or before January 1, 1958; $10.10 per share if redeemed on or before January 1, 1961; and $10 per share if redeemed later. On default in the payment of four consecutive quarterly dividends, the holders of the first preferred shares were entitled to elect one-third of the board of directors. As long as any of these shares were outstanding, the corporation required the consent of holders of two-thirds of the shares in order to permit the aggregate of the issued first preferred stock to exceed 300,000 shares; to authorize or issue any class of stock on a parity with or having priority over the first preferred stock; to pay dividends or make distributions in redemption with respect to any subordinate stock while there were unpaid accumulated dividends on the first preferred stock; or to pay any dividends or make any distributions in redemption if the aggregate of all dividends and distributions authorized from December 30, 1950, to the date of the proposed dividend or distribution exceeded the earned surplus arising during that period. Any holder of class B first preferred shares could convert them into class A first preferred shares on a share-for-share basis. The terms of the class A stock were similar to those of the class B stock, except that each year the corporation was obligated to redeem 7 percent of the aggregate number of issued class A shares at par value plus all accumulated unpaid dividends. In the event of a default in discharging this obligation, the corporation was prohibited from paying dividends or making distributions in redemption with respect to any subordinate stock. The holders of the second preferred stock were entitled to cumulative dividends at the rate of 6 percent, payable semiannually. They could not vote under any circumstances except as otherwise provided by law. The second preferred shares were redeemable at the option of the corporation at par plus all unpaid dividends accrued to the date of redemption.

Although petitioners made no effort prior to the recapitalization on December 27, 1951, to sell the class B first preferred shares, Glavin was advised by Steinmann on December 28, 1951, the day following the recapitalization, that members of the Blaustein family wished to sell

part of the shares issued, and he was asked to take charge of the offering. In a letter dated December 28, 1951, from Steinmann to Glavin, Steinmann stated:

Our clients proposed to convert not less than a million and a half and probably up to two million dollars of Second Preferred stock and First Preferred stock, and would like you to handle the sale of not less than a million and a half and up to two million dollars of First Preferred stock.

This is a formal authorization to offer this stock at par plus accumulated dividends. You are to receive compensation in the event of the sale equivalent to 1½% of the amount of the sale. * * *

In a letter under date of January 2, 1952, Glavin replied:

I believe two things are necessary before we make a positive step. First, I would like to know when you will decide how much you are going to sell. You speak of not less than $1,500,000 nor more than $2,000,000. It might not be good sales approach to talk to people on a variable amount, as it might give the atmosphere of uncertainty about our ability to sell it.

The other thing I should have is a basic memorandum describing American Trading, so that we will have all of the basic facts about the Company and its operations. Either as a part of such a memorandum, or to be used with it, should be some up-to-date financial statements as well as a ten-year record of earnings in reasonable detail. You have talked about preparing such a memorandum in your office and I would be delighted to have you do so if you are still so inclined. The other alternative would be for us to take a crack at a presentation memorandum and send it down to you for filling in the blanks and correcting the errors. I am perfectly clear that we should have all this information in presentable form before calling on a prospective buyer rather than going in half prepared and then trying to get answers to questions raised. * * *

The presentation memorandum discussed by Glavin in the foregoing letter was particularly necessary before offering the class B first preferred shares because Atapco was an unusual company and investors were not familiar with its management. From January to April 1952 Glavin and two of his associates at First Boston, together with Steinmann, worked on a presentation memorandum to be used in approaching possible purchasers of the class B first preferred shares. The memorandum was completed in early April.

First Boston began to offer the petitioners' shares after the presentation memorandum was completed. None of the shares of Henrietta Blaustein or Jacob Blaustein, trustee, which shares comprised 38 percent of the class B first preferred, was offered for sale. All potential buyers were to be approved by Jacob Blaustein before they could be approached by First Boston. Atapco was engaged in litigation with the Standard Oil Company of Indiana and Blaustein did not want the shares to get into the hands of the latter corporation directly or indirectly. First Boston confined its sales efforts to a limited number of prospects because a wider solicitation might have constituted a public offering requiring registration under the Securities Act.

On October 17, 1952, petitioners entered into contracts with Massachusetts Mutual Life Insurance Company, Phoenix Mutual Life

Insurance Company, the Lincoln National Life Insurance Company, Central Life Assurance Company, the Stein Roe & Farnham Fund Incorporated, and Milius Shoe Company, hereinafter sometimes referred to as the purchasers. Under these contracts petitioners agreed to sell and deliver and the purchaser agreed to buy and pay for an aggregate of 180,000 shares of Atapco class B first preferred stock at a price of $10 per share plus accrued dividends from September 1, 1952. Also on October 17, 1952, petitioners executed an indemnity agreement under which each of the petitioners agreed and undertook to indemnify and hold the purchasers harmless from any liability for or on account of any tax penalty or interest assessed or claimed against the purchasers or their assignees in respect of the issue of class A first preferred stock of Atapco upon conversion of shares of class B first preferred.

On October 17, 1952, the class B first preferred shares were held as follows:

|  | Class B first preferred |
|---|---|
| Jacob Blaustein, trustee | 88,000 |
| Henrietta Blaustein | 25,600 |
| Jacob Blaustein | 57,552 |
| Fanny B. Thalheimer | 62,672 |
| Ruth B. Rosenberg | 62,672 |

On October 23, 1952, petitioners delivered to the purchasers 180,000 shares of class B first preferred stock under the terms of the contracts and they received from each purchaser the following amounts:

| Name of company | Number of shares transferred | Gross amount received |
|---|---|---|
| **RUTH B. ROSENBERG** | | |
| Massachusetts Mutual Life Insurance Company | 17,118 | $172,416.30 |
| Phoenix Mutual Life Insurance Company | 17,118 | 172,416.30 |
| The Lincoln National Life Insurance Company | 17,118 | 172,416.30 |
| Central Life Assurance Company | 5,135 | 51,720.86 |
| The Stein Roe & Farnham Fund Incorporated | 3,424 | 34,487.29 |
| Milius Shoe Company | 1,712 | 17,243.64 |
| | 61,625 | 620,700.69 |
| **FANNY B. THALHEIMER** | | |
| Massachusetts Mutual Life Insurance Company | 17,118 | $172,416.30 |
| Phoenix Mutual Life Insurance Company | 17,118 | 172,416.30 |
| The Lincoln National Life Insurance Company | 17,118 | 172,416.30 |
| Central Life Assurance Company | 5,135 | 51,720.86 |
| The Stein Roe & Farnham Fund Incorporated | 3,424 | 34,487.29 |
| Milius Shoe Company | 1,712 | 17,243.64 |
| | 61,625 | 620,700.69 |
| **JACOB BLAUSTEIN** | | |
| Massachusetts Mutual Life Insurance Company | 15,764 | $158,778.51 |
| Phoenix Mutual Life Insurance Company | 15,764 | 158,778.51 |
| The Lincoln National Life Insurance Company | 15,764 | 158,778.51 |
| Central Life Assurance Company | 4,730 | 47,641.61 |
| The Stein Roe & Farnham Fund Incorporated | 3,152 | 31,747.64 |
| Milius Shoe Company | 1,576 | 15,873.82 |
| | 56,750 | 571,598.60 |

Atapco's charter was amended on October 17, 1952, to include additional protective provisions relating to the class A first preferred stock. The amendments required Atapco to obtain the consent of holders of two-thirds of the outstanding shares of that stock before incurring a funded debt which, together with the par value of the outstanding class A and class B first preferred stock, exceeded $10 million, and before selling or otherwise disposing of more than 10 percent of its shares in Pan American or Crown Central. At the time of the offering, insurance companies were generally uninterested in issues of preferred stock and were largely investing in bonds. The changes in the charter were recommended by Glavin in order to make the first preferred a more attractive investment. Glavin had previously been informed by Massachusetts Mutual and Lincoln National that they desired such protective provisions. Glavin felt it better to satisfy this group of highly desirable investors than enter into any extensive solicitation that might be deemed a public offering under the Securities Act.

The purchasers of the 180,000 class B first preferred shares exercised their option to convert them into class A first preferred shares on October 23, 1952, which was the same day that petitioners delivered the 180,000 shares of class B first preferred stock to the purchasers.

The petitioners paid $27,000 to First Boston as compensation for its services on their behalf in placing the 180,000 shares of class B first preferred stock. Of the $27,000 Jacob Blaustein paid $8,510.40, and Ruth B. Rosenberg and Fanny B. Thalheimer each paid $9,244.80. The petitioners also paid $7,751.11 for legal services and related disbursements in connection with the sales. Of the $7,751.11 Jacob Blaustein paid $2,443.15, and Ruth B. Rosenberg and Fanny B. Thalheimer each paid $2,653.98. The respondent has treated those payments as amounts deductible by the petitioners.

The earned surplus of Atapco appears on its corporate income tax return as $1,086,294.34 at the end of 1950. During 1950, $4,406,681.29 was "transferred to capital stock." In 1951 the amount at the end of the period was $686,791.25 which was the remainder following a reduction of earned surplus of $2,163,005 for "recapitalization." The earned surplus at the end of 1952 was not less than $2 million.

In 1951 Atapco was aware that the Commissioner was examining its records with respect to the possibility of a surtax under section 102, I.R.C. 1939, for 1948. However, a conferee recommended that no deficiency be asserted for 1948. Subsequently a deficiency was asserted under section 102 for the years 1951, 1952, and 1953. The case is pending before this Court, American Trading and Production Corporation, Docket No. 76554.

Between the years 1952 and 1958 Atapco's business continued to expand, two additional tankers were acquired and a third renovated.

In 1958 Jacob Blaustein and other executives of Atapco consulted Glavin with reference to methods of refinancing its outstanding obligations. It was finally decided to issue long-term notes which would be privately placed through First Boston. The amount of the proposed issue required Atapco to obtain the prior consent of the holders of the class A first preferred shares. It was Glavin's recommendation that the class A first preferred shares be redeemed. On December 2, 1958, 41,800 shares of class A first preferred stock were outstanding, Atapco having redeemed each year, in accordance with the provisions of its charter, 7 percent of the 180,000 class A first preferred shares originally outstanding. The remaining shares were redeemed on December 30, 1958.

On February 10, 1959, First Boston, as agent for Atapco, sold $7,500,000 of 5¼-percent sinking fund notes due December 1, 1973. Two-thirds of the notes were bought by five holders of the class A first preferred stock. These were Massachusetts Mutual Life Insurance Company, Phoenix Mutual Life Insurance Company, the Lincoln National Life Insurance Company, Central Life Assurance Company, and the Stein Roe & Farnham Fund Incorporated. Several other insurance companies also acquired portions of the notes because of the favorable response by the large institutions which had previously invested in the class A first preferred stock.

The petitioners' holding period for the class B first preferred shares sold by them on October 23, 1952, pursuant to the contracts of October 17, 1952, was more than 6 months. None of these shares was stock in trade of a holder thereof, or property of a kind properly includible in inventory if on hand at the close of the taxable year, or property held primarily for sale to customers in the ordinary course of a trade or business. The petitioners reported the following long-term capital gains after deducting the basis for the shares and the expenses of the sales and paid the following taxes:

|  | Gain | Tax |
|---|---|---|
| Ruth B. Rosenberg | $583,203.17 | $151,632.84 |
| Fanny B. Thalheimer | 583,203.17 | 151,632.84 |
| Jacob Blaustein | 537,071.45 | 139,638.58 |

The Commissioner determined that the amounts received by petitioners from the sale of the class B first preferred shares of Atapco were taxable as dividends under sections 22(a) and 115 of the Internal Revenue Code of 1939.

OPINION.

The instant case involves the siphoning off of the earnings and profits of a closely held corporation by a process which has come to be known as a "preferred stock bailout." After the earnings and profits have been capitalized the mechanics of the bailout varies with

the preferred stock being distributed either as a stock dividend as in *Chamberlin* v. *Commissioner*, 207 F. 2d 462 (C.A. 6, 1953), reversing 18 T.C. 164 (1952), or as in this case as part of a recapitalization. The distribution is followed by a sale of the stock, the purchasers usually being large corporate investors. The preferred shares are then redeemed by the issuing corporation within a reasonably short period of time so that the original shareholder's equity is only temporarily diluted.

In *Chamberlin* a corporation wanted to distribute its large accumulated earnings and profits but did not wish to declare a cash dividend. It settled on a plan whereby a pro rata dividend of cumulative preferred stock was issued to the common shareholders, common being the only class outstanding. Pursuant to a prearranged plan substantially all of the preferred shares were sold to two insurance companies which had formulated the terms of the issue. They provided that the shares would be redeemed over an 8-year period and also imposed restrictions on the corporation's assuming obligations, changing the capitalization, or paying dividends on the common stock. This Court held that such a preferred stock dividend when received was the equivalent of a cash dividend constituting ordinary taxable income. The Sixth Circuit reversed and held that the stock dividend was nontaxable following *Strassburger* v. *Commissioner*, 318 U.S. 604 (1943).

In the case before us the Commissioner takes the position that the taxable event was the sale of the class B first preferred shares. However, he determined that the proceeds were not long-term capital gains but were taxable as dividends under sections 22(a) and 115, I.R.C. 1939. The issue here though not identical to that presented in *Chamberlin*, is related due to the similar purpose in carrying out the transaction.

The theory of the Commissioner in arriving at his determination is that Atapco sold the first preferred shares directly to the corporate investors with the petitioners being mere conduits through whom the shares passed and the proceeds of the sales were then distributed to petitioners.

Petitioners argue that there was no prearranged plan between Atapco and the corporate investors as in *Chamberlin*. They contend that the negotiations to sell the first preferred shares were not commenced until after the recapitalization and were conducted entirely between the corporate investors and themselves.

The evidence substantiates petitioner's contention that there were no negotiations prior to the stock distribution, however we do not think that the form of the transaction is controlling as the Court of Appeals in *Chamberlin* apparently did.

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

*Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945).

Our conclusion after viewing the substance of the transaction as a whole is that it was a predetermined plan with Atapco and the petitioners acting in concert to bail out the large amount of earnings and profits which had accumulated in the corporation for petitioners' personal use and to avoid the imposition of a surtax under section 102.

The testimony that the preferred stock was issued in order to place Atapco shares in the hands of high-grade institutional investors and thereby establish the credit of the corporation with such investors and facilitate its later financing through such sources is not convincing. We think such a consideration was merely ancillary to the prime purpose of providing a route whereby petitioners could extract the earnings and profits from the corporation.

There is no doubt that the first preferred shares were designed to accomplish this preconceived plan. The class B first preferred shares initially distributed permitted the shareholders who had planned to hold the stock to do so without a mandatory yearly redemption, a feature of the class A first preferred. Such yearly redemptions would have been a dividend to those shareholders under 115(g), I.R.C. 1939. At the same time the conversion privilege allowed petitioners to sell their shares to the corporate investors which petitioners knew would immediately convert them to the class A shares as evidenced by the indemnity agreement executed by petitioners in connection with the sale of the class B shares to the corporate investors. A further consideration in utilizing this form was that it precluded any contention that the sale was an assignment of income by petitioners, *Helvering* v. *Horst*, 311 U.S. 112 (1940), *Hort* v. *Commissioner*, 313 U.S. 28 (1941), a theory predicated upon the fact that the yearly redemptions of the class A first preferred shares would have been dividends to petitioners. See sec. 115(g), I.R.C. 1939.

In *Chamberlin*, the Court of Appeals in commenting on the distribution of shares with a mandatory redemption provision similar to the shares in this case, stated at page 471 that:

Redemption features are well known and often used in corporate financing. If the * * * [redemption provision] was a reasonable one, not violative of the general principles of bona fide corporate financing, and acceptable to experienced bona fide investors familiar with investment fundamentals and the opportunities afforded by the investment market we fail to see how a court can properly classify the issue, by reason of the redemption feature, as lacking in good faith or as not being what it purports to be. * * * In our opinion, the redemption feature, qualified as it was with respect to premiums, amounts subject to redemption in each year, and the length of time the stock would be outstanding, together with the acceptance of the stock as an investment issue, did not destroy the bona fide quality of the issue. * * *

Similarly, petitioners defend the mandatory redemption provision of the class A shares as necessary, because institutional investors desire to reconsider their positions from time to time and such a provision enables them to do so periodically. We think such a contention has little significance insofar as the substance of the transaction is concerned. Assertions of such business reasons might be appropriate if the corporate purpose was to sell the shares to raise additional capital but that is not the situation here. As we view it, the purpose was to siphon off the corporate earnings and profits and the importance which we attach to the redemption provision is that it enabled petitioners to accomplish the plan without a permanent impairment of their ownership and control of the corporation.

Continuing with respect to the form of the transaction, petitioners claim that there were no negotiations to sell prior to the recapitalization in this case. While this is a fact to be considered, the controlling factor in ascertaining whether the sale was made by the corporation, as we see it, is the extent of the corporate activity throughout the entire transaction.

In *Commissioner* v. *Court Holding Co.*, *supra*, the corporation negotiated the sale of an apartment house; however, prior to the sale the asset was transferred in the form of a liquidating dividend to the shareholders who made the formal conveyance to the purchasers. This procedure was designed to avoid the imposition of a large income tax on the corporation. The Supreme Court held that it would treat the sale as if made by the corporation.

Conversely, in *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451, 453 (1950), a case similar to *Court Holding Co.*, the Supreme Court held that the sale was made by the shareholders after finding that "the liquidation and dissolution genuinely ended the corporation's activities and existence" and "at no time did the corporation plan to make the sale itself."

In a footnote in *Cumberland* at page 454, the Court said:

What we said in the Court Holding Co. case was an approval of the action of the Tax Court in looking beyond the papers executed by the corporation and shareholders in order to determine whether the sale there had actually been made by the corporation. We were but emphasizing the established

principle that in resolving such questions as who made a sale, fact finding tribunals in tax cases can consider motives, intent, and conduct in addition to what appears in written instruments used by parties to control rights as among themselves. See, e.g., Helvering v. Clifford, 309 U.S. 331, 335–337, 60 S. Ct. 554, 556–557, 84 L. Ed. 788; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S. Ct. 532, 90 L. Ed. 670, 164 A.L.R. 1135.

The motive and intent of the transaction here was to bail out the corporate earnings and profits. The corporation was closely held and its conduct was always subject to the petitioners' dictates. Proof that Atapco was a pawn of petitioners' always ready to comply with their command is the fact that the corporate charter was amended to include certain protective provisions with respect to the first preferred shares when it became evident that petitioners could more easily dispose of the stock if such provisions were included in the charter. We believe that when a closely held corporation, manipulated by its shareholders, distributes shares to such shareholders with the knowledge that they will immediately be sold as part of a scheme to avoid taxes and the corporation then plays an active role in the subsequent disposal, the sale in substance is made by the corporation with the distribution to and sale by the shareholders being a transitory step with no independent significance. See *United States* v. *Lynch*, 192 F. 2d 718 (C.A. 9, 1951), certiorari denied 343 U.S. 934 (1952).

In the course of its reversing opinion in *Chamberlin* the Sixth Circuit said at page 471 that:

A non-taxable stock dividend does not become a taxable cash dividend upon its sale by the recipient. On the contrary, it is a sale of a capital asset. * * *

* * * * * * *

* * * although the stockholder *acquired* money in the final analysis, he did not *receive* either money or property *from* the corporation. Sec. 115 (a), Internal Revenue Code, in dealing with taxable dividends, defines a dividend as "any distribution *made by a corporation* to its shareholders, whether in money or in other property * * * out of its earnings or profits * * *." [Emphasis added.] The money he received was received from the insurance companies. It was not a "distribution" by the corporation declaring the dividend, as required by the statute.

We are of the opinion that Congress under section 115, I.R.C. 1939, clearly intended to tax such distributions out of earnings and profits at ordinary income rates. The fact that the money did not physically pass between Atapco and the petitioners should not be the sole determinant. We believe the question to be answered is whether the net effect of the transaction was the realization of a dividend by the shareholders made by the corporation out of its earnings and profits.

The courts have had little difficulty in finding that a shareholder realizes a dividend when the corporation discharges his indebtedness even though there has been no physical flow of money or property

728

between the corporation and the shareholder. See *Duffin* v. *Lucas*, 55 F. 2d 786 (C.A. 6, 1930), where the court held that when a corporation paid an indebtedness of a shareholder "it was analogous to and more or less equivalent to a regular earned and declared dividend and taxable as such" even "though it never came to his hands directly" from the corporation. See also *United States* v. *Joliet & Chicago R. Co.*, 315 U.S. 44 (1942); *Commissioner* v. *Western Union Telegraph Co.*, 141 F. 2d 774 (C.A. 2, 1944).

The net effect of the transaction in this case shows the realization of a dividend by petitioners. We think that to look only to the form of the transaction and ignore the substance gives credence to the circuitous method employed to achieve the dividend distribution. "A given result at the end of a straight path is not made a different result because reached by a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609 (1938). Accordingly, we sustain the Commissioner's determination.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

FISHER, *J.*, did not participate in the consideration and disposition of this case.