Russell E. Phelon and Jean G. Phelon v. Commissioner.
Phelon v. Commissioner
Docket No. 3299-64.
United States Tax Court
T.C. Memo 1966-199; 1966 Tax Ct. Memo LEXIS 86; 25 T.C.M. (CCH) 1024; T.C.M. (RIA) 66199; September 12, 1966
*86 In 1958 P was commissioned by the Springfield Library and Museums Association to procure a large male elephant for mounting and display at its Museum of Natural History. P, after obtaining a ruling from respondent permitting him to deduct transportation costs, meals and lodging, and the expenses of mounting and shipping the specimen to the Museum, made a safari to Africa and procured a large elephant, called "Suicide Sam." On June 11, 1959, P executed a personal contract with J, a taxidermist, in which P agreed to pay J $20,000 for mounting the elephant. On April 1, 1960, P created P Foundation, which is tax exempt. On April 26, 1960, P transferred 2,300 shares of stock in Russell Industries, Inc., a controlled corporation, to P Foundation. On June 1, 1960, the corporation redeemed the 2,300 shares from P Foundation for $15,893, the liquidating value of the stock. On the same day P Foundation donated $13,500 of the proceeds to the Museum and on June 3, 1960, sent the Museum Association a check in that amount with instructions to pay J the balance due him under the contract between P and J. Held, that P received a taxable dividend to the extent the proceeds of the stock redemption *87 were used to satisfy his indebtedness to J. Clarence R. Brooks, 1387 Main St., Springfield, Mass., for the petitioners. Lawrence A. Wright, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion
*88 DAWSON, Judge: Respondent determined a deficiency in the income tax of petitioners for the year 1960 in the amount of $9,740.80. At issue is whether a donation by petitioners of capital stock in their controlled corporation to a charitable foundation followed shortly thereafter by the corporation's redemption of the stock and the use of the proceeds of the redemption by the foundation to satisfy a personal debt of petitioner Russell Phelon resulted in a taxable dividend to him under the provisions of sections 301 and 302(d), Internal Revenue Code of 1954. [1]
Findings of Fact The stipulated facts and exhibits are incorporated by this reference. Russell E. and Jean G. Phelon were husband and wife in 1960 and resided at 114 Prynwood Road, Longmeadow, Massachusetts. They filed their joint Federal income tax return for the taxable year 1960 with the district director of internal revenue at Boston, Massachusetts. During 1960 and for several years prior thereto, Russell Phelon (hereafter called petitioner) had an active interest in the Springfield *89 Library and Museums Association and had made substantial contributions to it. In 1960 the petitioner was also a trustee of the Association. On October 7, 1958, a meeting of the board of trustees of the Association was held and the following vote was taken: VOTED to allow the President in the name and on behalf of the Association to sign a power-of-attorney to Clarence R. Brooks of 1387 Main Street, Springfield, to represent the Association before the U.S. Treasury Department regarding a proposed trip of Russell E. Phelon of Longmeadow, Massachusetts, to South Africa to collect for the Springfield Museum of Natural History a suitable specimen of an elephant, rhinoceros, or giraffe. The petitioner had applied and received on November 26, 1958, a ruling permitting him to deduct transportation costs, meals and lodging, and expenses of mounting and shipping an elephant, a rhinoceros or giraffe to the Springfield Museum of Natural History. On December 22, 1958, the Association issued a Letter of Commission to petitioner to procure for the Museum of Natural History a large male elephant of approximately 11 feet shoulder height. The Letter of Commission provided, in part, as follows: *90 Each specimen must be normal and representative of the finest development of the species. Mounting is to be done by Louis Paul Jonas of Hudson, New York or such other taxidermist as may be approved by the Museum. All field work, such as skinning, drying and preparation of the material for shipment, must be done in accordance with the specifications and requirements of the taxidermist. You are also commissioned to procure additional speciments or articles of interest from British East Africa if, in your judgment, they will meet the requirements and needs of our Museum of Natural History. This may include the taking of motion and still photographs and making of sound recordings of animals and birds in their native African environment. This commission is to be exercised and executed without expense to the Springfield Library and Museums Association. In the spring of 1959 the petitioner made a safari to British East Africa to procure a large male elephant. The specimen, called "Suicide Sam," was procured and portions of the elephant consisting of the hide, tusks, and head were shipped to the United States for mounting by Louis Paul Jonas. On June 11, 1959, the petitioner entered *91 into a personal contract with Louis Paul Jonas (hereafter sometimes called Jonas) whereby Jonas agreed to mount the elephant in a manner suitable to the Association for $20,000 to be paid in three installments by the petitioner. The contract provided, in pertinent part, as follows: 1. Phelon engages the services of Jonas to mount one African elephant from skin and other materials delivered to Jonas by Phelon. 2. Jonas hereby accepts such employment and agrees to devote such of his time, skill, energy, attention and the best of his ability as may be necessary to mount said specimen upon a suitable natural habitat base and on or before August 1st, 1960, to deliver the same to the Museum and to set up and install the same upon an octagonal-shaped woodwork platform to be supplied by the Museum. 3. Phelon shall pay Jonas for such services the sum of Twenty Thousand Dollars ($20,000.00) as follows: $6,667.00
upon the signing of this
Agreement;
$6,666.00
when the services to be
rendered by Jonas are two-
thirds (2/3) completed;
$6,667.00
when the mounting of the
specimen is completed, de-
livered and installed satis-
factorily at the Museum.
*92 4. Jonas will advise the Museum when the work of mounting the aforesaid specimen has been two-thirds (2/3) completed so that inspection may be made by the duly authorized representatives of the Museum. 5. If Jonas should die or should become incapacitated so that the services to be rendered by him hereunder cannot be completely performed, Phelon may terminate this contract upon written notice mailed to Jonas or his legal representatives at the address herein stated, and as soon as practicable thereafter, Phelon shall pay to Jonas or his legal representatives the fair value of his services up to the time of such death or disability, but in no event shall the total amount to be paid by Phelon on account of such services exceed that proportion of the total contract price that the amount of services performed bears to the total of said services required for complete performance of this Agreement. 6. Phelon shall insure said specimen against destruction or damage by fire or other unavoidable casualty, and in the event of such destruction or damage so that it is thereafter impossible for Jonas to perform the duties required under this Agreement, this Agreement shall terminate and Phelon *93 shall pay Jonas the fair value of his services to the date of such destruction or damage, but in no event shall the amount so paid exceed that proportion of the total contract price as the amount of services performed bears to the total of said services required for the complete performance of this Agreement. 7. It is mutually agreed that the Museum shall be the sole judge of any question arising regarding the services of Jonas, the quality of the same and the satisfactory completion of the same, and the decision of the Museum shall be final and binding upon the parties hereto, and without limiting the generality of the foregoing, the Museum shall be the sole judge of the following: (a) When the services to be performed by Jonas have been two-thirds (2/3) completed. (b) In the event of the death or disability of Jonas or in the event of the destruction or damage of the specimen by fire or other unavoidable casualty, the extent or amount of services rendered by Jonas prior to such event in terms of the total services to be rendered by Jonas under this Agreement. (c) When the services of mounting, delivering and installing said specimen at the Museum have been satisfactorily *94 completed. 8. This Agreement shall be binding upon and shall inure to the benefit of the heirs, executors and administrators of the parties hereto. In accordance with the provisions of the contract the petitioner paid Jonas the sum of $6,667 upon the signing of the agreement, leaving a balance of $13,333 due under the terms thereof. On March 25, 1960, when the second payment to Jonas was due from petitioner, the payment was made by having the Third National Bank and Trust Company of Springfield give Jonas $6,666 in cash in return for his execution of a 60-day personal note for such amount and the note was in turn guaranteed by the petitioner. Prior to 1959 Russell Industries, Inc., a Massachusetts corporation, was engaged in the manufacture of parts for magnetos. The corporation had only one class of stock, i.e., common stock with a par value of $1 per share. The petitioner was the principal stockholder, owning or controlling through his wife and minor children, prior to the year 1960, 83 1/3 percent of all outstanding stock. In 1959 Russell Industries was having labor troubles and, during the last 6 months of that year, it sold its machinery and equipment and proceeded *95 to liquidate its inventory. The last month for which rent was paid on the premises it occupied in East Longmeadow, Massachusetts, was November 1959. On January 1, 1960, the assets of Russell Industries had been reduced to cash or accounts receivable. On April 1, 1960, the petitioner caused to be created The Phelon Foundation, and on March 25, 1964, the foundation received a ruling from the Commissioner of Internal Revenue that it was tax exempt. On April 26, 1960, the petitioner (a trustee of The Phelon Foundation) transferred 2,300 shares of stock in Russell Industries to the Foundation. After this gift the petitioner owned or controlled 72 percent of the stock of Russell Industries. At the time the gift was made it was expected that Russell Industries would be liquidated and that the assets of the corporation would be reduced to cash and each shareholder would receive his proportionate share. However, in May 1960, the petitioner visited a principal customer in Tecumseh, Michigan, and was told by that customer that a manufacturing facility would have to be established or acquired close to the customer if the R. E. Phelon Company, Inc., which supplied the customer with magnetos, *96 was to participate in the following year's business. This customer had previously urged that the flywheel operation be moved closer to the Midwest. As a result of this development, the petitioner continued his trip to Richmond, Illinois, and made arrangements to purchase a factory and land there from Arnold N. May, with whom he had had negotiations about two years earlier. On May 23, 1960, the petitioner took an option on the property in his own name. On May 31, 1960, a special meeting of the directors of Russell Industries was held at which the possible advantages of operating a plant in Richmond, Illinois, for the manufacture of flywheels for small gasoline motors was outlined. The directors voted to take an assignment of the option to purchase the Richmond property and voted to authorize the petitioner in his discretion to exercise such option and acquire the machinery and equipment necessary to enable the corporation to begin the manufacture of flywheels in Illinois within a 90-day period. At the same meeting the financial position of the corporation was discussed and it was considered whether its assets should be invested in short-term securities or whether some of the corporation's *97 stock should be redeemed. The directors of the corporation voted to send a letter to all stockholders offering to redeem the corporation's stock at a price of $6.91 per share and on May 31, 1960, such a letter was addressed to all stockholders of Russell Industries. On June 1, 1960, the trustees of The Phelon Foundation (the petitioner, his attorney, Clarence Brooks, and Russell V. Day) voted to accept the offer of Russell Industries to redeem the 2,300 shares of stock held by the Foundation. The trustees also voted to contribute $13,500 to the Springfield Library and Museums Association for furtherance of its plans for expansion of its Museum of Natural History. However, on June 3, 1960, the petitioner, acting on behalf of the Foundation, sent a check for $13,500 payable to the Springfield Library and Museums Association. The check was accompanied by a letter, also dated June 3, 1960, addressed to Eugene Shaw, Treasurer of the Association which reads, in part, as follows: This contribution is being made to allow the Museum of Natural History to pay the remaining two installments to the Taxidermist, Louis Paul Jonas of Hudson, New York, for the cost of mounting the African Elephant *98 which I collected for it. The sum of $6,666.00 is due Mr. Jonas now. In lieu of this payment and pending the establishment of this Foundation, the $6,666.00 has been made available to Mr. Jonas through a loan made to him by the Third National Bank and Trust Company. I am an endorser of this note. The note is due Tuesday, June 7th. Would you please have the Museum Association pay off this note at the Third National Bank prior to June 7th. An additional payment to Mr. Jonas in the amount of $6,667.00 will be due on the setting up of the specimen and its completion in the Museum sometime after the first of July. The Museum Association should also make this payment, leaving a balance of $167.00 for incidentals in connection with its installation. The Springfield Library and Museums Association used the money received from the Foundation to pay off the balance due on the personal contract between the petitioner and Jonas. The second payment was made on June 6, 1960, in the amount of $6,666 and the third and final payment was made on July 12, 1960, in the amount of $6,667. When the petitioner donated 2,300 shares of stock in his controlled corporation, Russell Industries, to his *99 controlled charitable foundation, The Phelon Foundation, he intended that the stock would be converted by his controlled corporation into cash and that the cash would be used by the Foundation to satisfy his personal indebtedness to Jonas. Gifts to the Springfield Library and Museums Association from the Foundation during the years 1960 and 1961, as reflected on the books and records of the Association, are as follows: Date of donation
Amount
Ledger notation
June 6, 1960
$6,666
Special gift account
June 6, 1960
6,834
Special gift account
January 1, 1961
1,250
Phelon Foundation
February 13, 1961
310
Phelon Foundation
In their joint Federal income tax return for the taxable year 1960 the petitioner claimed and were allowed a deduction of $15,893 for the contribution of the stock to The Phelon Foundation. In his notice of deficiency dated April 10, 1964, the respondent included in the income of petitioners the sum of $15,893 with the following explanation: It has been determined that you realized additional dividend income in the amount of $15,893.00, as the result of the redemption of stock by Russell Industries, Inc. Since you failed to report *100 this in your income tax return, your taxable income is increased $15,893.00. Opinion Applicable provisions of the Internal Revenue Code are set out below. [2]
*101 Respondent contends that the distribution in the redemption of 2,300 shares of stock held by The Phelon Foundation in Russell Industries resulted in a distribution essentially equivalent to a dividend to petitioner because the net effect of all steps of the transactions was that petitioner's controlled corporation satisfied his personal obligation to Jonas. Petitioner counters with five points, viz., (1) there was no prearrangement that the stock would be redeemed when petitioner gave the shares of stock in Russell Industries to The Phelon Foundation; (2) the effect of the redemption, rather than the purpose which activated it, controls the determination of dividend equivalence; (3) the petitioner derived no economic benefit from the redemption; (4) there was no discharge of petitioner's indebtedness as a result of the redemption; and (5) "by tenuous rationalization" a charitable contribution should not be converted into a taxable event. We agree with the respondent. Although the intricate web of these transactions may appear somewhat arcane, the stipulated facts and evidence clearly show that the petitioner controlled Russell Industries, Inc., The Phelon Foundation, his indebtedness *102 to Louis Paul Jonas, and that he was one of the trustees of the Springfield Library and Museums Association in 1960. He had a great deal of influence on all the steps involved in these transactions. In our view the result intended and accomplished by the events which occurred was to enable Russell Industries, Inc., to satisfy a personal indebtedness of petitioner from corporate surplus with the same net effect as if that corporation had paid a dividend to petitioner and petitioner had then utilized the dividend to satisfy his personal debt. Neither The Phelon Foundation nor the Springfield Library and Museums Association retained the redemption proceeds, nor was it intended that they retain them. Instead, the redemption proceeds were used, at petitioner's direction, to satisfy the payments due on his personal contract with Jonas. It is well settled that corporate payments to third parties in discharge of a shareholder's personal debts and liabilities are treated as dividend distributions to the shareholder within the meaning of section 301. See Ferro v. Commissioner, 242 F. 2d 838 *103 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; Wall v. United States, 164 F. 2d 462 (C.A. 4, 1947); Louis H. Zipp, 28 T.C. 314 (1957), affirmed per curiam 259 F. 2d 119 (C.A. 6, 1958), certiorari denied 359 U.S. 934; Irving Sachs, 32 T.C. 815 (1959), affirmed 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833; Schalk Chemical Co., 32 T.C. 879 (1959), affirmed 304 F. 2d 48 (C.A. 9, 1962); and William F. Wolf, Jr., 43 T.C. 652 (1965), affirmed 357 F. 2d 483 (C.A. 9, 1966). Aside from the fact that the redemption proceeds were partly used to satisfy a personal obligation of the petitioner, we think the redemption distribution was, in substance, a distribution from Russell Industries to petitioner within the purview of section 301. In our judgment the facts establish that the contribution of the stock by petitioner in his closely held corporation to a charitable foundation created by him, followed shortly thereafter by a redemption of the stock by the corporation, were all steps in a prearranged transaction *104 the net effect of which, when considered together, was a redemption from the petitioner. Cf. Estate of Henry A. Rosenberg, 36 T.C. 716, 725, 727-728 (1961); Montgomery Engineering Company v. United States, 230 F. Supp. 838, 844 (D.N.J. 1964), affirmed per curiam 344 F. 2d 996 (C.A. 3, 1965). In short, we believe that there was a prearrangement; that the facts here give rise to a constructive dividend to petitioner; that the petitioner was not merely acting as a conduit of the Springfield Library and Museums Association in entering into the contract with Jonas; and that there was a discharge of petitioner's indebtedness to Jonas as a result of the stock redemption. We disagree with petitioner's argument that no dividend resulted from what occurred because he received no economic benefit from the redemption of the stock either directly or indirectly. In March 1960, the petitioner was indebted on a personal contract to Jonas for approximately $13,500. Petitioner had accumulated cash sufficient to satisfy this indebtedness and presumably, considering his tax bracket, he had paid considerable income tax on his accumulated cash. He also had *105 stock in a closely held corporation which had a par value of $1 per share but a liquidating book value of $6.91 per share. This appreciation in value of the stock had never been taxed because prior to that time the appreciation was neither realized nor recognized. Obviously, if the petitioner could satisfy his personal debt by having his closely held corporation pay it off from accumulated surplus, then he would have an economic benefit from the payment of a personal debt by a separate taxable entity without any new tax liability to him. It was down such tax saving path that he wanted to travel. To say that he realized no direct or indirect economic benefit would result in a complete disregard of the realities of the transactions which took place. Petitioner received a tax deduction, which is not in issue in this proceeding, for the full amount of the charitable contribution which resulted from the payment of his personal indebtedness to Jonas. The receipt of this deduction at no out-of-pocket cost to him was in itself a substantial economic benefit. The petitioner also maintains that the step-transaction argument advanced by the respondent must fail since some of the steps occurred *106 after the redemption. The step that occurred after the redemption was the payment of the redemption proceeds over to the Springfield Library and Museums Association to satisfy the personal indebtedness of petitioner to Jonas. We think the facts here show that the entire purpose of the original transfer of stock, the vote to redeem, the redemption and the payment of the proceeds of the redemption over to the Association were all geared to the satisfaction of petitioner's debt to Jonas. The individual steps were all part of one, single, integrated transaction. Consequently, the resulting constructive dividend is inescapable. We hold that the petitioner received what was essentially equivalent to a taxable dividend to the extent the proceeds of the stock redemption were used to satisfy his personal indebtedness to Jonas. Accordingly, Decision will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). (b) Amount Distributed. - (1) General Rule. - For purposes of this section, the amount of any distribution shall be - (A) Noncorporate Distributees. - If the shareholder is not a corporation, the amount of money received, plus the fair market value of the other property received. * * *
(c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount Constituting Dividend. - That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule. - If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges. - (1) Redemptions Not Equivalent to Dividends. - Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. * * *
(d) Redemptions Treated as Distributions of Property. - Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to th extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection. SEC. 317. OTHER DEFINITIONS. (a) Property. - For purposes of this part, the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).↩