ARNOLD MALKAN AND AUDREY MALKAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4788–66.    Filed June 17, 1970.

*Whitfield J. Collins* and *Allan Howeth*, for the petitioners.
*Harry H. Ellis*, for the respondent.

## OPINION

The principal issue is a variation of the familiar problem of substance versus form. There is no dispute that gain was realized on the sale of the 10,500 shares of GTC stock; the question is, who realized the gain, the four trusts or petitioner? Emphasizing his long-term plans to create trusts and the signing of the trust instruments before the underwriting agreement, petitioner insists that the trusts made the sale and realized the gain therefrom. Respondent, on the other hand, urges that the substance of the transaction is that petitioner himself made the sale, and then placed the proceeds thereof in trust. We think respondent has the better of the argument.

Petitioner has shown that he had discussed creation of trusts for

his family members several months before he signed the trust instruments on July 18, 1958; that the agreement with GTC of June 26, 1958, refers to trusts to be created, as do the registration papers filed with the SEC; that in correspondence with the attorneys for the representatives of the underwriters petitioner explained that the creation of the trusts was a feature of the plan; and that he reexecuted the trust instruments on July 21, 1958, the day before he signed the contract with the underwriters. Asserting that this latter contract was "the first written agreement of any kind between a seller and a purchaser, and the petitioner could not have been bound to sell his shares to anyone prior to the execution of this agreement on July 22," and relying principally on *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Preston R. Bassett*, 33 B.T.A. 182 (1935), affirmed per curiam 90 F.2d 1004 (C.A. 2, 1937); and *Martin* v. *Machiz*, 251 F.Supp. 381 (D.Md. 1966), petitioner asks us to hold that the four trusts, not he, realized the gain on the sale of the 10,500 GTC shares.

The basic principle to be applied in cases such as this is that "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945); *Hindes* v. *United States*, 326 F.2d 150 (C.A. 5, 1964), certiorari denied 377 U.S. 908 (1964); *Harry C. Usher, Sr.*, 45 T.C. 205 (1965); *Virginia W. Stettinius Dudley*, 32 T.C. 564 (1959), affirmed per curiam 279 F.2d 219 (C.A. 2, 1960). Stated another way, "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938).

Petitioner's heavy emphasis on the fact that he executed the trust instruments before he signed the contract with the underwriters misconceives the rule. Where the issue is whether an individual is acting for himself or for trusts of which he is trustee, the chronological sequence of the steps taken to accomplish a preconceived objective (here, a sale) may have little to do with determining who in truth and substance made the sale. Thus, by analogy, when a closely held corporation, "manipulated by its shareholders," distributes properties "with the knowledge that they will immediately be sold as part of a scheme to avoid taxes and the corporation then plays an active role in the subsequent disposal, the sale in substance is made by the corporation." *Estate of Henry A. Rosenberg*, 36 T.C. 716, 727 (1961), citing *United States* v. *Lynch*, 192 F.2d 718 (C.A. 9, 1951), certiorari denied 343 U.S. 934 (1952). This doctrine also controls other stockholder-corporation transactions. See, e.g., *Abbott* v. *Commissioner*, 342 F.2d 997 (C.A. 5, 1965), affirming per curiam a Memorandum

Opinion of this Court; *S. Nicholas Jacobs*, 21 T.C. 165, 169 (1953), affd. 224 F.2d 412 (C.A. 9, 1955); cf. *Kimbell-Diamond Milling Co.* v. *Commissioner*, 187 F.2d 718 (C.A. 5, 1951), affirming 14 T.C. 74 (1950), certiorari denied 342 U.S. 827 (1951). We fail to see why this same principle should not apply to transactions involving trusts created by a taxpayer with a view to their serving as conduits of title in effectuating a sale to a third party.

Thus, we do not limit our inquiry to a determination of whether creation of the trusts preceded the execution of a binding contract with the underwriters. "Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." *Commissioner* v. *Court Holding Co., supra* at 334. Our examination must focus on the realities of the transaction rather than the refinements of legal title, the verbiage of written instruments, or the chronological order of formal events. So viewed, we think it plain that, in substance, petitioner rather than the trusts made the sale of the 10,500 shares of GTC stock to the underwriters.

By July 21, 1958, the date petitioner reexecuted the four trust instruments, the terms of the sale had been cast. As early as June 10, 1958, he and other GTC stockholders had agreed to sell 100,000 unregistered GTC shares, 73,888 of which were owned by him. A registration statement and two amendments thereto had been filed with the SEC to register the shares so that they could be sold at a public offering. The second amendment, bearing the printed date of July 21, 1958, but submitted to the SEC on July 19, specified the selling price of the shares. A contract also bearing the date of July 21 had been negotiated with the underwriters, in which they agreed to purchase the stock. Quite obviously, the details of these documents had been decided upon several days previously. Thus, prior to any transfer to the trusts petitioner had carried on negotiations and reached an understanding with the purchasers regarding the terms of the sale. See *S. Nicholas Jacobs, supra.* All of these negotiations were handled by petitioner in his individual capacity and not as trustee; indeed, the trusts were not even in existence.[1] Furthermore, at the time he created the trusts, petitioner contemplated that sale of the stock would be immediately completed, and in his individual capacity he played an active role in closing the sale. See *Estate of Henry A. Rosenberg, supra.*

---

[1] That petitioner felt free—even in the absence of a retained power to revoke, alter, or amend—to destroy the last page of the trust declarations signed on July 18, 1958, and to execute new instruments on July 21, 1958, similar in all respects except for a provision that New Jersey law was to control their interpretation, suggests that the very existence of the trusts may have been tentative in character, i.e., subject to revocation if the sale had not been completed.

At no time prior to execution of the agreement with the underwriters on July 22 did petitioner, as trustee, have custody of the 10,500 shares. Even though petitioner had discussed creating the trusts for several months, he did not establish them until the parties had agreed upon the details of the sale. Thus, there was never any intention that the trusts would hold the shares themselves—only the proceeds of their sale. We think it clear that petitioner took care to execute the trust instruments before completing the sale only so that the trusts could serve as conduits for the transmission of title.

Finally, although not essential to our conclusion, we note that the purported gift of the 10,500 shares to the trusts was not completed prior to the sale, because the shares were never delivered to petitioner in his capacity as trustee. Indeed, it appears that on July 21, 1958, petitioner merely signed the declarations of trust, making no change in custody of his stock; the certificate for all of his GTC shares had been pledged to the Franklin National Bank and remained so until the sale was closed on July 29, 1958.[2] Under New York law,[3] since the shares were held by that bank, actual delivery of them to the trusts was impractical, see *Schwartzman v. Kimler*, 52 Misc. 2d 102, 275 N.Y.S. 2d 330 (Civ. Ct. 1966); and although symbolic delivery would be sufficient in these circumstances, such delivery requires that there be at least a transfer of record on the corporate stock books. *In re Szabo's Estate*, 10 N.Y. 2d 94, 176 N.E. 2d 395 (1961). Petitioner has not shown that there was such a transfer prior to July 22 or even prior to the closing on July 29.

Turning now to the cases relied upon by petitioner, we find nothing in them to aid his cause. We note that each case in this area turns on its own facts. As to *Cumberland*, the obverse of *Court Holding*, this Court explained in *Waltham Netoco Theatres, Inc.*, 49 T.C. 399, 405 (1968), affd. 401 F. 2d 333 (C.A. 1, 1968), that "The presence of substantial negotiations on behalf of the shareholders, not to mention the fact that the corporation expressly refused to sell the asset at the corporate level, was the distinguishing feature in *Cumberland*." In the present case, none of the negotiations were conducted on the

---

[2] The record is not entirely clear regarding the certificates evidencing petitioner's GTC shares. Petitioner had lost his original certificate—described in the trust instruments as representing 89,033 shares and in the underwriting agreement as representing 89,888 shares—and a replacement certificate was issued for 89,888 shares. Apparently this replacement was the certificate which had been pledged by petitioner to the Franklin National Bank and was later delivered at the closing. And although the trust declarations refer to separately numbered certificates, spaces were left for the certificate numbers, which were evidently inserted at a later date. But, regardless of which certificate or certificates the Franklin National Bank held, the important thing is that the 10,500 shares purportedly placed in trust were in that bank's possession until the closing.

[3] The trust instruments provide that they "shall be construed according to the laws of the State of New Jersey." But New Jersey law holds that the question of whether a transfer of securities to an inter vivos trust has been made is governed by the law of the situs of such securities. See *In re Damato*, 86 N.J. Super. 107, 206 A.2d 171 (1965). Thus, since the securities were located in New York, GTC was a New York corporation, and all of the significant events occurred in New York, the law of that State is determinative.

trusts' behalf, and petitioner did not condition the sale of his shares on creation of the trusts.

In *Preston R. Bassett, supra*, decided before *Court Holding*, the substance-versus-form dichotomy was given only minor consideration; the principal ground for decision was an interpretation of a section of the Revenue Act of 1928. But even the formal facts in that case are clearly distinguishable from those in the present one. There the taxpayer delivered the shares in question to his attorney on April 10, with instructions to place them in trust for his wife. Then, on April 12, the trust instrument was formally executed. On the same day an agreement for the sale of the stock to a third party was reached, and on the following day a contract embodying this agreement was executed. Therefore, as was pointed out in *Harry C. Usher, Sr., supra* at 216–217, "the taxpayer had not, prior to the transfer of certain stock in trust, reached an agreement for the sale of the stock to a third party." Here, in contrast, the terms of such an agreement—as reflected in the final prospectus and underwriting agreement, both bearing the printed date of July 21, 1958—had been agreed upon in advance of the creation of the trusts.

The third case relied on by petitioner, *Martin* v. *Machiz, supra*, involved a transfer of stock to a charitable trust followed by a sale. That it is distinguishable from the instant controversy is readily apparent from the following ultimate facts found by the District Court (251 F. Supp. at 390):

While there is some evidence to support defendant's position, the preponderance of the evidence establishes that the concept of a charitable trust originated before and independently of the sale, the deed of trust was executed before and independently of the sale, and at the time the deed of trust was executed no mutual understanding or meeting of the minds or contract existed between the parties. In short, the Court finds as an ultimate fact that the substance of the transaction was precisely in accordance with its form.

No similar findings as to the independence of the sale from the creation of the trusts can be made here. The sale of petitioner's shares was always an integral part of the plan to create the trusts for his family members; and the declarations of trust were executed only after all of the terms of the sale had been agreed upon and included in a contract which petitioner signed the next day.[4]

[4] On brief respondent raised an alternative argument that, even if the sale was made by the trusts, the income therefrom was or could have been applied at petitioner's discretion in discharge of a legal obligation of his, see sec. 1.677,(a)–1(d), Income Tax Regs., that he therefore is to be treated under sec. 677, I.R.C. 1954, as the owner of the trust corpora, and that consequently, he is taxable on the gains realized by the trusts under sec. 671, I.R.C. 1954. Petitioner objects to this contention on the ground that no predicate for it is laid in the deficiency notice, pleadings, or opening statement of counsel for respondent, and that he has been prejudiced by a failure of proof arising from this new contention. Cf. *Boe* v. *Commissioner*, 307 F.2d 339, 342 (C.A. 9, 1962), affirming 35 T.C. 720 (1961). Our conclusion that the gain from the sale of the 10,500 shares is taxable to petitioner is in no respect based on this alternative position of respondent.

The final issue involves a determination of the basis of the shares sold by petitioner. Section 1012, I.R.C. 1954, states that as a general rule the basis of property shall be the cost of such property. Section 1.1012–1(c)(1), Income Tax Regs.,[5] provides that if shares of stock acquired on different dates or at different prices are "sold or transferred," and are identified as to the date and price at which purchased, their basis is the actual price of such shares; on the other hand, if the shares sold cannot be adequately identified, their basis is determined by application of a "first-in, first-out" (Fifo) rule.

Both petitioner and respondent agree that the 73,888 shares sold to the underwriters were not singled out and identified by petitioner from the total of 89,888 shares held by him, and that he did not determine their actual cost basis. Accordingly, we must apply the Fifo rule. Respondent asserts that the first, and only, transfer of shares by petitioner was the delivery by the official of the Franklin National Bank of the single certificate for all of petitioner's shares at the closing on July 29, 1958. Petitioner, on the other hand, maintains that the letter agreement of June 26, 1958, subjecting 16,000 shares of his GTC stock to an escrow agreement granting GTC a 3-year option to purchase them, was the first transfer; that the second transfer was of the 10,500 shares to the four trusts; and that the 63,388 shares which he sold on July 29, 1958, were transferred last.

The phrase "sold or transferred" is not defined in regulations section 1.1012–1(c). The regulations under the 1939 Code, in applying the Fifo rule, spoke only of the *sale* of stock. Sec. 39.22(a)–8(a), Regs. 118. It is clear, therefore, that the present regulation's reference to a sale or transfer contemplates certain dispositions other than sales. Since the Fifo rule applies only when the shares sold or transferred are not adequately identified, the rule creates a constructive identification; the meaning of the term "transfer" must be measured against this purpose.

The letter agreement of June 26, 1958, provided that at or prior to the closing petitioner would deposit 16,000 shares of GTC stock with a bank designated by GTC as escrow agent, under an agreement which was to constitute an assignment to GTC of all of petitioner's right, title, and interest in those securities. On July 14, 1958, peti-

---

[5] Sec. 1.1012–1 *Basis of property.*

(c) *Sale of stock*—(1) *In general.* If shares of stock in a corporation are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred shall be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock and in order to determine the holding period of such stock for purposes of subchapter P, chapter 1 of the Code. If, on the other hand, the lot from which the stock is sold or transferred can be adequately identified, the rule stated in the preceding sentence is not applicable. * * *

tioner, GTC, and the Franklin National Bank (which already held all of petitioner's GTC stock as security for a loan) as escrow agent entered into an agreement, the terms of which were identical to those set out in the June 26 letter. Petitioner thereby relinquished dominion and control over the 16,000 shares and could no longer use them to vary the basis of his remaining shares. We conclude, therefore, that the assignment of petitioner's interest in the 16,000 shares under the escrow agreement constituted a transfer, within the meaning of the regulation, on July 14, 1958, i.e., prior to the closing.

Since we have concluded that petitioner in substance sold all of the 73,888 shares offered for his account and the account of his family trusts, we need not differentiate between the 10,500 shares purportedly sold by the trusts and the remaining 63,388 shares. Therefore, we hold that the sale by petitioner of the 73,888 GTC shares to the underwriters constituted the second sale or transfer for the purpose of determining the basis of the shares in question under the Fifo rule.

*Decision will be entered under Rule 50.*